20 P.3d 634

**In the Interest of Jane DOE,**
Born on June 20, 1995.

No. 21972.

Intermediate Court of Appeals of Hawai'i.

Dec. 22, 2000.

Richard S. Kawana, on the briefs, for mother-appellant.

James W. Walther, Kris S. Murakami, and Mary Anne Magnier, Deputy Attorneys General, State of Hawai'i, on the briefs, for Department of Human Services-appellee.

BURNS, C.J., WATANABE, J., and Circuit Judge MARKS in place of LIM, J., Recused.

Opinion of the Court by WATANABE, J.

This child protective services (CPS) case requires us to review the propriety of an order of permanent custody that involuntarily divested a mother of her parental and custodial rights and duties (parental rights) in her youngest child.

The undisputed evidence in the record is that Appellant, the legal and natural mother (Mother) of Jane Doe, born on June 20, 1995 (Jane), deeply loves and is devoted to Jane. Jane is equally bonded to Mother, has always been well-dressed and properly cared for while in Mother's custody, and has never been physically or sexually abused or harmed while in Mother's care. Mother has no history of substance abuse and has always shown the utmost concern for Jane's well-being and progress. Moreover, because Mother earnestly desired to keep her relationship with Jane, she yielded to the advice of social workers and others employed or engaged by Petitioner Appellee Department of Human Services for the State of Hawai'i (DHS), who felt that she had "too much on her plate," and voluntarily relinquished her parental rights in her older children so that she could focus on raising and nurturing Jane.

Nevertheless, the Family Court of the First Circuit (the family court) determined that Mother was not presently willing and able, and it was not reasonably foreseeable that Mother would become willing and able, to provide Jane with a safe family home because "there is no likelihood that she would sufficiently resolve her problems at any identifiable point in the future."

Among the "problems" mentioned by the family court in its decision were: (1) Mother's limited insight as to how issues regarding her own physical and sexual abuse affect her judgment and ability to provide for her children's needs; (2) Mother's Dependent Personality Disorder, which "negatively impacts Mother's ability to provide a safe family home for [Jane] because of difficulty in making independent decisions, tending to choose partners that are high risk, and exercising poor judgment"; (3) Mother's passive parenting style; (4) Mother's lack of understanding and consistency in providing structure, guidance, and discipline to Jane; (5) Mother's inconsistency in attending therapy sessions; (6) the fact that Mother has never been employed and has no training or education that would enable her to secure employment; (7) Mother's inability to be protective of Jane; and (8) Mother's dishonesty "regarding child care and the status of her living arrangements or personal relationships."

Accordingly, the family court entered a July 30, 1998 order that, in part, divested Mother of her parental rights in Jane, awarded permanent custody of Jane to DHS, and established a permanent plan for Jane (Permanent Custody Order).

Based on our review of the record in this case, we conclude that there was no clear and convincing evidence before the family court to support the entry of that part of the Permanent Custody Order that divested Mother of her parental rights in Jane. Accordingly, we reverse that part of the July 30, 1998 Permanent Custody Order that divested Mother of her parental rights in Jane and awarded permanent custody of Jane to DHS.[1]

---

1. The Order Awarding Permanent Custody (Permanent Custody Order) entered by the Family Court of the First Circuit (the family court) on

July 30, 1998 also divested the natural father (Father) of Jane Doe (Jane) of his parental and custodial rights and duties (parental rights) in

## BACKGROUND

Born on October 15, 1965, Mother was physically and sexually abused by her father (Grandfather) when she was between ten and fourteen years old. She kept the abuse a secret until she was seventeen years old and, following her disclosure, received counseling. Mother became pregnant when she was fifteen years old and gave birth on October 30, 1981 to her first child (Oldest Daughter), the product of a two-year relationship with Oldest Daughter's father. Unfortunately, history repeated itself and Grandfather, at some point not clear from the record, sexually assaulted Oldest Daughter.

In 1986, Mother married a man (Legal Father), with whom she had three children: Son 1, born on July 19, 1986; and twin sons, Sons 2 and 3, born on June 8, 1989. Legal Father was allegedly an alcoholic who physically abused Mother and the children. He also sexually assaulted Oldest Daughter and, as a consequence, was convicted, sentenced, and deported to Western Samoa, with orders not to return to Hawai'i until 1996.[2]

In April 1988, the allegations of physical and sexual abuse by Legal Father prompted DHS to file a petition on behalf of Oldest Daughter and Son 1 (the twins had not yet been born), seeking to protect them from sexual and physical harm, respectively, by Legal Father (CPS Case No. 1). Son 1 was returned to Mother's home that same month. Oldest Daughter was initially placed in foster custody. However, about six years later, in May 1994, the family court revoked its foster

custody order and appointed a guardian over Oldest Daughter. DHS then closed CPS Case No. 1.

On July 21, 1991, Mother gave birth to Daughter 2, the product of Mother's relationship with a third man.

In April 1993, Mother informed DHS that she was involved with Defendant Father (Father). DHS learned thereafter of allegations that Father had physically abused his children by a prior marriage; DHS also learned that Father had been convicted, incarcerated, and was then on probation for sexually molesting his daughter by the prior marriage.[3] Among the terms of Father's probation was that he have no contact with children and that he participate in services for sex offenders.[4]

In February 1995, DHS filed a petition seeking foster custody of Sons 1, 2, and 3 and Daughter 2 (CPS Case No. 2) "due to threatened harm and lack of medical/mental care by Mother and because Mother failed to voluntarily participate in recommended services."[5] On March 28, 1995, all four children were placed in DHS foster custody.

Meanwhile, as a result of her relationship with Father, Mother had become pregnant, and on June 20, 1995, she gave birth to Jane at the Kapiolani Medical Center for Women and Children (KMC). Father was present for the birth, having received permission from his probation officer to attend the delivery.[6] The next day, police officers showed

Jane. Father has not filed an appeal from the Permanent Custody Order.

2. The record does not indicate when the husband of Jane's legal and natural mother (Legal Father) was convicted and deported to Western Samoa.

3. Father claims that he pleaded "no contest" to the sex assault charge upon the advice of his lawyer, who stated that all of Father's children were prepared to testify against him at trial and Father was facing twenty years in prison. Father insists that the sex assault charge was filed by his ex-wife as a retaliatory measure, after he went to drug dealers who were selling her drugs and asked them to stop, and after he administered a beating to her boyfriend upon learning that the boyfriend had physically abused Father's oldest son.

4. The record indicates that Father attended all sex offender service programs that he was ordered to attend pursuant to his probation terms.

5. Although the record on appeal contains documents that specifically refer to related cases involving Appellant (Mother), the legal and natural mother of Jane, the other case files were not made part of the record in this appeal.

6. It appears from the record that although Mother had filed for divorce from Legal Father, the divorce had not been finalized at the time of Jane's birth. Accordingly, Jane's presumed father was Legal Father, and he was initially named as a defendant in this action by Petitioner–Appellee Department of Human Services for the State of Hawai'i (DHS). After Father formally acknowledged his paternity of Jane, however, Legal Father was dismissed as a party to this action.

up at KMC and, pursuant to Hawai'i Revised Statutes (HRS) § 587–22 (1993),[7] took Jane into protective custody and turned her over to DHS, which placed her in a foster home.

## PROCEDURAL HISTORY

### A. The Petition for Temporary Foster Custody

On June 23, 1995, three days after Jane was born, DHS filed a petition for temporary custody (the Petition) in the family court, alleging that there was "a reasonable foreseeable substantial risk that harm may occur to [Jane] based upon an assessment of the criteria set forth in HRS [§] 587–25."[8] The Petition requested that: (1) an inquiry be made into allegations that Jane's "physical or psychological health or welfare [was] subject to imminent harm, harmed[,] or subject to threatened harm by the acts or omissions of [Jane's] family"; (2) temporary foster custody of Jane be awarded to an appropriate authorized agency; (3) jurisdiction be established over Jane and other appropriate family members; (4) such other orders be entered as the family court deemed appropriate; and (5) Mother's and Father's respective parental rights be terminated "unless the family is willing and able to provide [Jane] with a safe family home,

even with the assistance of a service plan, within a reasonable period of time."

The facts and circumstances mentioned in the Petition as supporting the allegation that Jane was subject to "a reasonable [sic] foreseeable substantial risk of harm" included the following: (1) Mother's five other children were already in foster care or under legal guardianship as a result of DHS's intervention in two other CPS cases; (2) Mother's compliance with court-ordered services in her other CPS cases had been poor; (3) Mother was still married to Jane's Legal Father, who had been convicted of sexually abusing Oldest Daughter and accused of physically abusing Mother and her other children; (4) Mother remained in a relationship with Father, even though she knew of Father's prior criminal history; and (5) Mother had allowed Father to spend the night in the same bedroom as Daughter 2.

### B. The Adjudication Hearing on the Petition

The adjudication hearing[9] on the Petition was held before the family court on July 10 and 13, 1995. Three witnesses testified for DHS.

Dr. Steven Choy (Dr. Choy), a clinical psychologist employed by KMC as the Director of the Kapiolani Child Protection Cen-

---

7. At the time, Hawai'i Revised Statutes (HRS) § 587–22 (1993) provided as follows:

**Protective custody by police officer without court order.** (a) A police officer shall assume protective custody of a child without a court order and without the consent of the child's family regardless of whether the child's family is absent, if in the discretion of such police officer, the child is in such circumstance or condition that the child's family presents a situation of imminent harm to the child.

(b) A police officer who assumes protective custody of a child immediately shall complete transfer of protective custody to the department by presenting physical custody of the child to the department, unless the child is or presently will be admitted to a hospital or similar institution, in which case the police officer immediately shall complete transfer of protective custody to the department by so informing the department and receiving an acknowledgment from the hospital or similar institution that it has been informed that the child is under the temporary foster custody of the department.

(c) Under the completion of the transfer of protective custody of a child by a police officer to

the department, the department shall automatically assume temporary foster custody of the child.

8. HRS § 587–25 (1993) sets forth a number of "safe family home guidelines" which "shall be fully considered when determining whether the child's family is willing and able to provide the child with a safe family home."

9. HRS § 587–62(a) (1993) provides that "[w]hen a petition has been filed, the court shall set a return date to be held within fifteen days of (1) the filing of the petition or (2) the date a decision is orally stated by the court on the record in a temporary foster custody hearing." On the return date, "the court shall preside over a pretrial conference" and may enter certain orders, including an order that the case be set "for an adjudication hearing or, if adjudication is stipulated to, a disposition hearing as soon as is practicable," except that if the child is to remain in temporary custody, the hearing is generally required to be held within ten working days of the return date. HRS § 587–62(b).

ter, testified that "this is a case where there has been generational sexual, physical abuse in addition to neglect." Based on his review of the case files and past records involving Jane's family, Dr. Choy opined that "the risk of neglect and physical abuse [of Jane]-by partners also-would be high." Dr. Choy explained that in his experience, and based on "child development knowledge, a child under five is the most vulnerable child to both neglect and abuse.... An infant [Jane's] age-in fact, all of our cases as we did studies on them, show that severe abuse and death cases occurred with children under the age of three. So, that the risk becomes extremely high for that age group." Dr. Choy stated, however, that "[t]he issue of the sex abuse is something that is less prevalent at this point given the age of the child."

Dr. Choy testified that although he had not personally interviewed Mother, he had reviewed a psychological evaluation of Mother done by Dr. Russell Loo (Dr. Loo) and that Dr. Loo's diagnosis was that Mother had "a dependent personality disorder." Dr. Choy explained that

[a] person who has a dependent personality disorder basically is an individual who has an extreme difficulty making independent decisions, tends to rely on other people to make decisions or control that person's life.

Generally the person with this disorder tends to choose and—and there has—if you look at the historical aspect of this disorder to qualify—generally chooses spouses or relationships that are abusive in nature.

The—the—they're at a high risk of problems with neglect and poor judgment because of their inability to make independent decisions.

Dr. Choy opined that based on Mother's personality disorder, coupled with Mother's history of being abused and neglected and Mother's failure to follow through with recommended services, "the prognosis would be poor in terms of her being able to take care of her child—an infant."

On cross-examination by Mother's counsel, Dr. Choy admitted that his opinions were based on his review of previous case files in which the "last major input was ... the ending and beginning of 1990, 1991." Dr. Choy testified that he did not have any personal knowledge of Mother's current situation and did not know that Mother and Father were not residing together, a factor that "would make a difference." Dr. Choy also stated that he was not aware that Father was on probation, was being supervised by a probation officer, and was not allowed, under the terms and conditions of his probation, to be present with children. Finally, Dr. Choy admitted that he did not realize that Legal Father, who was alleged to have physically abused Son 1 and sexually assaulted Oldest Daughter, had been convicted, sentenced, and deported for his sexual assault of Oldest Daughter, and was no longer in Hawai'i to endanger Jane and her half-siblings.

Jean Oshiro (Oshiro), Father's probation officer, testified that one of the terms of Father's probation was that "he's not to make—not make or attempt to make contact directly or indirectly with any minor child or reside in the same residence with minor children without he [sic] permission of the probation officer." However, Oshiro learned after the fact that Father had allowed Mother into his bedroom with Daughter 2. Oshiro testified that Father "had asked for permission to visit with [Jane]. And the—the terms of that was that he was going to visit with supervision at the CPS office. And I said that was okay." On cross-examination, Oshiro confirmed that following the incident in which Father had allowed Mother into his bedroom with Daughter 2, Father had done nothing to cause Oshiro to feel that she needed to file a motion to revoke Father's probation.

The final DHS witness was Yumi Kawaji[10] (Kawaji), the social worker (SW) who filed the Petition on DHS's behalf. Kawaji testified that the DHS case involving Mother's family had been transferred to her sometime in July or August of the previous year.

---

10. From the record on appeal, it appears that the name of DHS social worker (SW) Yumi Kawaji changed at some point during the proceedings below to Yumi Suzuki. For purposes of this opinion, we will refer to her as "Kawaji."

Sometime in the middle of October 1994, Kawaji explained, DHS began receiving calls "from Makaha Elementary School expressing concerns for the deteriorating condition of [Sons 1, 2, and 3]." Kawaji stated that she had also received calls from family members and community and service providers expressing concern that Mother "had become non[-]compliant and wasn't following through with services and that the children were being neglected for periods of time." Kawaji testified that because of the following concerns about Mother, DHS believed that Jane was in imminent harm and in need of temporary foster custody:

[S]he failed to participate consistently in the parenting and support group services provided through visitation center, even before she provided us with her medical note.

She has been resistant to participating in services to address her own sex abuse, physical abuse and her own issues from childhood, which continue to be unresolved.

And she continues to insist that she does not understand why the other children were placed out of her care to begin with. And she continues to insist that she does not want—she does not understand why [DHS] has some concerns about her choice of relationships. We're not saying she can't do it, but she fails to understand any of the protective issues.

And those are [DHS's] concerns. And again, the history—the long history and the non[-]compliance, her impaired judgment the Department believed was cause for concern—for imminent concern[.]

. . . .

To briefly summarize [DHS's] concerns . . . if mom can't protect that's a big concern.

And her actions and her inability or lack of motivation or little bit of both to do services and make progress is a concern. . . .

However, the failure to progress, the failure to initiate and to engage in services—which is a chronic pattern—contributed to our decision to place into foster care.

Kawaji testified that she would not consider placing Jane with her maternal grandmother or aunt because this case involved "generational abuse, . . . generational lack—lack of protection, . . . generational protection of adults and their perpetrators versus the victims." When asked by Mother's defense counsel what Mother needed to demonstrate to DHS before Jane could be returned to her, Kawaji stated:

In addition to participating in home[-]based services and/or participating in parenting and the support groups, co-dependency groups, [DHS] must insist this time that [Mother] participate in and make progress in areas of her own abuse, her own molestation, her own family dynamics and co-dependency.

[Mother] must demonstrate a commitment to her own self healing—if you want to call it that. Without that, there is concern that she will not be able to recognize harm should it be happening, that she would be able to adequately protect her children from—from being set up for harm—if you want to call it that.

So [DHS] believes very strongly that given this history, [M]other must engage in and make progress in her individual psychotherapy and address her own issues of victimization.

On cross-examination, Kawaji was asked about DHS's closure of CPS Case No. 1. Kawaji stated that the case was closed with respect to Oldest Daughter because Oldest Daughter had been placed in guardianship. With respect to Son 1, the case was closed because Mother had at least minimally complied with the service plan ordered for her by the family court so that there was at least minimally adequate parenting. When she was asked to explain the circumstances that prompted DHS to file CPS Case No. 2 against Mother, Kawaji stated that after DHS began receiving calls from service providers, DHS was "concerned about neglect as well as threatened harm." The following colloquy then transpired as to what harm Son 1 was threatened with:

Q. —well, as I understand it, your testimony was that your—your reports were

that he wasn't being taken care of. That was the—

A. There was the report that he wasn't being take [sic] care of, correct.

Q. Right. Neglect.

There was no problem with getting beaten up or anything like that?

A. No, not with getting beaten up. No.

Q. Okay.

So, and as a matter of fact, [Son 1] is one of those young children who—who does have sort of a learning deficits [sic]?

A. He has attention deficit.

Q. Attention deficits and he needs medication—

A. Yes.

Q. —that type of thing?

And that was one of the problems that—because of his—his extra needs, that—service providers felt that he was being neglected or he wasn't getting enough attention, isn't that right?

A. I don't believe it was because of this extra needs that they were—they thought he was being neglected. He was being neglected because [Mother] was leaving them with various people irregardless of whether he had attention deficit or not.

On further cross-examination, Kawaji admitted that DHS's Petition did not allege that Mother was in any way neglecting or physically abusing Jane, or causing Jane to be sexually abused. Kawaji insisted, however, that based on numerous anonymous and confidential phone calls, DHS believed that Jane was subject to threatened harm. Kawaji recalled, for example, that an anonymous call had been placed to DHS, alleging that Mother had mentioned to relatives that she planned to take Jane to Father's house since she didn't believe that DHS would be out to her home for at least a week.

Kawaji stated that Mother had been "noncompliant" and had "broken terms of court orders in the past." For example, Mother did not perform certain required services during her pregnancy with Jane, claiming

that she was required to "be on bed rest." Kawaji admitted on cross-examination, however, that Mother had provided a doctor's slip, confirming that she was to be on bed rest, although Kawaji was not sure exactly when Mother started to need bed rest.

Regarding Mother's inability to protect Jane from harm, Kawaji testified that DHS was concerned about "[s]exual, physical, and alcohol abuse" by various perpetrators, specifically Grandfather, Legal Father, and Father. Kawaji mentioned, for example, that Mother's ability to protect Jane from Grandfather was of concern because "Mother's thinking that [Grandfather's] dying of cancer [11] and he's harmless," but it's "a myth ... that because they're old, they're harmless, innocent people." As to Mother's ability to protect Jane from Legal Father, Kawaji acknowledged that Legal Father had been deported to Samoa and was "gone." Furthermore, Kawaji testified that the primary focus of DHS's Petition was Father.

Mother testified at the hearing that she understood that Father was on probation and was subject to restrictions during his visits with Jane. She also was aware that Father needed to obtain permission from his probation officer before he could be present with Jane and, as a result, she had insisted that Father get permission so he could be present for Jane's birth. Mother stated that at twelve o'clock the day after Jane was born, she was supposed to breast-feed Jane; however, she was told by a nurse that she "could not take the baby out of the nursery until [she] talked to the worker. And then the worker, ... wanted [Mother] to sign this paper to put the child in foster custody." Mother stated that she had planned to go home to her house in Wai'anae after leaving KMC and that her mother and sister-in-law were waiting for her. Mother had a crib "all set up in [her] room[,]" had bought diapers, "had everything, ... had her car seat all ready, [and] ... had [Jane's] clothes for her to come home in." She had no plans to go to Father's house because "[o]ver at his house there's no crib for the baby."

11. The record on appeal indicates that Mother's father (Grandfather) did die shortly thereafter of

cancer, never having seen Jane, except by photographs, because of the court orders in place.

Regarding her relationship with Father, Mother acknowledged that at one time she said she was going to break up her relationship with him. However, she testified that she and Father talked it over and figured "maybe we could be a family together, resume—you know, he loves my kids, he never did hurt none of my kids." Mother testified that she was aware of DHS's concerns and "wouldn't let nothing happen to my kids." According to Mother, Grandfather has never seen Daughter 2 and that because of what Grandfather had done to Mother, "alls he get is pictures of [Daughter 2]." Mother testified that she had protected her kids, especially Daughter 2, because she didn't want Daughter 2 to go through what Oldest Daughter did. She admitted that she had taken Daughter 2 to Father's house "once or twice" but testified that she wasn't aware, until she later talked to Father's probation officer, about the condition of Father's probation. When questioned about how she squared her claim that she protected Daughter 2 with her having brought Daughter 2 on a visit to Father's home, Mother stated: "I was there with [Daughter 2] all the time. I never let her go. She was with me twenty-four hours a day." Mother also testified that she had

taught Daughter 2 that she should never let anybody touch her "down there" and that she should let Mother know right away if she were touched "the wrong way[.]"

Regarding DHS's allegations that she had not consistently participated in court-ordered services in the related CPS cases, Mother testified that she had been going to her parenting class and had five more weeks to go before getting her diploma. Mother acknowledged that she had missed some of her support group meetings but noted that she regularly visited with her children, except when she had a doctor's appointment or her "kids were sick[.]" She also confirmed that she did most of her court-ordered services until she was ordered to bed rest during her pregnancy with Jane.

### C. The Order Awarding DHS Temporary Family Supervision

Following the contested hearing on the petition held on July 10 and 13, 1995, the family court determined that Jane was not in imminent danger of harm as defined in HRS § 587–2 (1993)[12] and awarded temporary

---

12. HRS § 587–2 (1993) states, in relevant part, as follows:

"Imminent harm" means that there exists reasonable cause to believe that harm to the child will occur or reoccur within the next ninety days with due consideration being given to the age of the child and to the safe family home guidelines, as set forth in section 587–25.
The term "harm" is defined in the same section as follows:
"Harm" to a child's physical or psychological health or welfare occurs in a case where there exists evidence of injury, including, but not limited to:
(1) Any case where the child exhibits evidence of:
(A) Substantial or multiple skin bruising or any other internal bleeding,
(B) Any injury to skin causing substantial bleeding,
(C) Malnutrition,
(D) Failure to thrive,
(E) Burn or burns,
(F) Poisoning,
(G) Fracture of any bone,
(H) Subdural hematoma,
(I) Soft tissue swelling,
(J) Extreme pain,
(K) Extreme mental distress,

(L) Gross degradation, or
(M) Death, and
the injury is not justifiably explained, or where the history given concerning the condition or death is at variance with the degree or type of the condition or death, or circumstances indicate that the condition or death may not be the product of an accidental occurrence;
(2) Any case where the child has been the victim of sexual contact or conduct, including, but not limited to, rape, sodomy, molestation, sexual fondling, incest, prostitution; obscene or pornographic photographing, filming, or depiction; or other similar forms of sexual exploitation;
(3) Any case where there exists injury to the psychological capacity of a child as is evidenced by a substantial impairment in the child's ability to function;
(4) Any case where the child is not provided in a timely manner with adequate food, clothing, shelter, psychological care, physical care, medical care, or supervision; or
(5) Any case where the child is provided with dangerous, harmful, or detrimental drugs as defined by section 712–1240; however, this paragraph shall not apply to a child's family who provide the drugs to the child pursuant to the direction or prescription of a practitioner, as defined in section 712–1240.

family supervision,[13] rather than temporary foster custody,[14] over Jane. The family court

13. HRS § 587–2 defines "[t]emporary family supervision" as "a legal status created under [chapter 587] pursuant to an order of the court whereby the department assumes the duties and rights of family supervision over a child and the child's family members who are parties prior to a determination at a disposition proceeding." "Family supervision" is defined in the same statutory section, in relevant part, as follows:

"Family supervision" means the legal status created pursuant to this section, section 587–21(b)(2), or by an order of court after the court has determined that the child is presently in the legal or permanent custody of a family which is willing and able, with the assistance of a service plan, to provide the child with a safe family home. Family supervision vests in an authorized agency the following duties and rights, subject to such restriction as the court deems to be in the best interests of the child:

(1) To monitor and supervise the child and the child's family members who are parties, including, but not limited to, reasonable access to each of the family members who are parties, and into the child's family home; and

(2) To have authority to place the child in foster care and thereby automatically assume temporary foster custody or foster custody of the child. Upon placement, the authorized agency shall immediately notify the court. Upon notification, the court shall set the case for a temporary foster custody hearing within three working days or, if jurisdiction has been established, a disposition or a review hearing within ten working days of the child's placement, unless the court deems a later date to be in the best interests of the child.

14. HRS § 587–2 defines "temporary foster custody" as "a legal status created under this chapter with or without order of the court whereby the department ·[of human services] assumes the duties and rights of a foster custodian over a child." "Foster custody" is defined in the same section, in pertinent part, as follows:

"Foster custody" means the legal status created pursuant to this section, section 587–21(b)(2), or by an order of court after the court has determined that the child's family is not presently willing and able to provide the child with a safe family home, even with the assistance of a service plan:

(1) Foster custody vests in a foster custodian the following duties and rights:

(A) To determine where and with whom the child shall be placed in foster care; provided that the child shall not be placed in foster care outside the State without prior order of the court; provided further that, subsequent to the temporary foster custody hearing, unless otherwise ordered by the court, the temporary foster custodian or the foster custodian may permit the child to resume residence with the family from which the child was removed after providing prior written notice to the court and to all parties, which notice shall state that there is no objection of any party to the return; and upon the return of the child to the family, temporary foster custody, or foster custody automatically shall be revoked and the child and the child's family members who are parties shall be under the temporary family supervision or the family supervision of the former temporary foster custodian or foster custodian;

(B) To assure that the child is provided in a timely manner with adequate food, clothing, shelter, psychological care, physical care, medical care, supervision, and other necessities;

(C) To monitor the provision to the child of appropriate education;

(D) To provide all consents which are required for the child's physical or psychological health or welfare, including, but not limited to, ordinary medical, dental, psychiatric, psychological, educational, employment, recreational, or social needs; and to provide all consents for any other medical or psychological care or treatment, including, but not limited to, surgery, if the care or treatment is deemed by two physicians or two psychologists, whomever is appropriate, licensed or authorized to practice in this State to be necessary for the child's physical or psychological health or welfare, and the persons who are otherwise authorized to provide the consent are unable or have refused to consent to the care or treatment;

(E) To provide consent to the recording of a statement pursuant to section 587–43; and

(F) To provide the court with information concerning the child that the court may require at any time.

(2) The court, in its discretion, may vest foster custody of a child in any authorized agency or subsequent authorized agencies, in the child's best interests; provided that the rights and duties which are so assumed by an authorized agency shall supersede the rights and duties of any legal or permanent custodian of the child, other than as is provided in paragraph (4).

. . . .

(4) Unless otherwise ordered by the court, a child's family member shall retain the following rights and responsibilities after a transfer of temporary foster custody or foster custody, to the extent that the family member possessed the rights and responsibilities prior to the transfer of temporary foster custody or foster custody, to wit: the right of reasonable supervised or unsupervised visitation at the discretion of the authorized agency; the right to consent to adoption, to marriage, or to

then ordered Mother to:

- participate in individual therapy to address her sex abuse issues
- make an appointment and attend her appointment with the service providers regarding sex abuse counseling prior to Jane being returned home
- participate in family counseling
- participate in parenting classes, including home[-]based services
- participate in counseling related to domestic violence
- participate in an update psychological evaluation if recommended by DHS
- provide DHS with a list of her child care [sic] providers

- keep all appointments.

Father was ordered to continue with sex abuse treatment and anger management classes, pursuant to the terms of his probation.

The family court ordered the parties to return for a hearing on July 31, 1995.

D. *The Order Awarding DHS Family Supervision*

At the July 31, 1995 return hearing, the family court found, based upon the reports submitted pursuant to HRS § 587–40 (1993) [15] and the court record, that there was "an adequate basis to sustain the petition in that [Jane] is a child ... whose physical or

major medical or psychological care or treatment, except as provided in paragraph (1)(D); and the continuing responsibility for support of the child, including, but not limited to, repayment for the cost of any and all care, treatment, or any other service supplied or provided by the temporary foster custodian, the foster custodian, or the court for the child's benefit.

**15.** HRS § 587–40 (1993) stated, in relevant part:
**Reports to be submitted by the department and authorized agencies; social worker expertise.** (a) The department or other appropriate authorized agency shall make every reasonable effort to submit written reports, or a written explanation regarding why a report is not being submitted timely, to the court with copies to the parties or their counsel or guardian ad litem [(GAL)]:

(1) Within forty-eight hours, excluding Saturdays, Sundays, and holidays, subsequent to the hour of the filing of a petition for temporary foster custody pursuant to section 587–21(b)(3);

(2) Upon the date of the filing of a petition pursuant to section 587–21(b)(4); and

(3) At least fifteen days prior to the date set for each disposition, review, permanent plan, and permanent plan review hearing, until jurisdiction is terminated, unless a different period of time is ordered by the court or the court orders that no report is required for a specific hearing; or

(4) Prior to or upon the date of a hearing if the report is supplemental to a report which was submitted pursuant to paragraph (1), (2), or (3).

(b) Report or reports pursuant to subsection (a) specifically shall:

(1) Assess fully all relevant prior and current information concerning each of the safe family home guidelines, as set forth in section 587–25, except for a report required for an uncontested review hearing or a

permanent plan review hearing which need only assess relevant current information including, for a review hearing, the degree of the family's progress with services;

(2) In each proceeding, subsequent to adjudication, recommend as to whether the court should order:

(A) A service plan as set forth in section 587–26 or revision or revisions to the existing service plan, and if so, set forth the proposed service or services or revision or revisions and the pertinent number or numbers of the guidelines considered in the report or reports, made pursuant to paragraph (1), which guideline or guidelines provide the basis for recommending the service or services or revision or revisions in a service plan or revised service plan; or

(B) A permanent plan or revision to an existing permanent plan and if it is an initial recommendation, set forth the basis for the recommendation which shall include, but not be limited to, an evaluation of each of the criteria set forth in section 587–73(a), including the written permanent plan as set forth in section 587–27; and

(3) Set forth recommendations as to such other orders as are deemed to be appropriate and state the basis for recommending that the orders be entered.

(c) A written report submitted pursuant to subsection (a) shall be admissible and may be relied upon to the extent of its probative value in any proceeding under this chapter; provided that the person or persons who prepared the report may be subject to direct and cross-examination as to any matter in the report, unless the person is unavailable.

(d) A person employed by the department as a social worker in the area of child protective or child welfare services is qualified to testify as an expert in the area of social work and child protective or child welfare services.

psychological health or welfare has been harmed or is subject to threatened harm by the acts or omissions of Jane's family."

The family court awarded "family supervision" rather than "foster custody" over Jane and ordered that: (1) DHS and Jane's guardian ad litem (GAL) prepare separate reports; (2) DHS prepare an appropriate service plan [16]; (3) copies of the reports and plan be submitted to the family court and all parties by August 17, 1995; and (4) the parties appear at a service plan hearing on September 1, 1995. The family court also ordered Mother to refrain from allowing contact between Jane and Grandfather, and to "inform all child care [sic] providers of all existing [CPS case] orders concerning [Jane]."

Additionally, the family court entered an order, enjoining and restraining Father from personally contacting Jane (including phoning, visiting, and remaining within three blocks of Jane's residence), except as arranged and approved by DHS, in consultation with Jane's GAL and Father's probation officer.

### E. DHS's Assumption of Foster Custody Over Jane

On August 14, 1995, DHS removed Jane from Mother's home and assumed "foster custody" of Jane because on August 10, 1995, during a visitation with Jane at a DHS office, Mother and Father allegedly violated (1) the family court's restraining order prohibiting Father from having contact with Jane except when approved by DHS, the GAL, and Father's probation officer, RA 136–38; and (2)

---

16. HRS § 587–26 (1993) sets out the requirements for a service plan, as follows:

**Service plan.** (a) A service plan is a specific written plan prepared by an authorized agency and child's family and presented to such members of the child's family as the appropriate authorized agency deems to be necessary to the success of the plan, including, but not limited to, the member or members of the child's family who have legal custody, guardianship, or permanent custody of the child at the time that the service plan is being formulated or revised under this chapter.

(b) The service plan should set forth:

(1) The steps that will be necessary to facilitate the return of the child to a safe family home, if the proposed placement of the child is in foster care under foster custody;

(2) The steps that will be necessary for the child to remain in a safe family home with the assistance of a service plan, if the proposed placement of the child is in a family home under family supervision; and

(3) The steps that will be necessary to make the family home a safe family home and to terminate the appropriate authorized agency's intervention into the family and eliminate, if possible, the necessity for the filing of a petition with the court under this chapter.

(c) The service plan should also include, but not necessarily be limited to:

(1) The specific, measurable, behavioral changes that must be achieved by the parties; the specific services or treatment that the parties will be provided and the specific actions the parties must take or specific responsibilities that the parties must assume; the time frames during which the services will be provided and such actions must be completed and responsibilities must be assumed; provided that, services and assistance should be presented in a manner that does not confuse or overwhelm the parties;

(2) The specific consequences that may be reasonably anticipated to result from the parties' success or failure in making the family home a safe family home, including, but not limited to, the consequence that, unless the family is willing and able to provide the child with a safe family home within the reasonable period of time specified in the service plan, their respective parental and custodial duties and rights shall be subject to termination by award of permanent custody; and

(3) Such other terms and conditions as the appropriate authorized agency deems to be necessary to the success of the service plan.

(d) The service plan should include steps that are structured and presented in a manner which reflects careful consideration and balancing the priority, intensity, and quantity of the service which are needed with the family's ability to benefit from those services.

(e) After each term and condition of the service plan has been thoroughly explained to and is understood by each member of the child's family whom the appropriate authorized agency deems to be necessary to the success of the service plan, the service plan shall be agreed to and signed by each family member. Thereafter, a copy of the service plan shall be provided to each family member who signed the service plan.

(f) If a member of a child's family whom the appropriate authorized agency deems to be necessary to the success of the service plan cannot or does not understand or agree to the terms and conditions set forth in the service plan, the authorized agency shall proceed pursuant to section 587–21(b).

the terms and conditions of Father's probation.

On August 24, 1995, as a result of Father and Mother's alleged violation of the restraining order, DHS filed a Motion for an Immediate Review Hearing on Jane's status. In a Safe Family Home Guidelines Report dated August 21, 1995 that was attached to DHS's motion, DHS described the events that precipitated the motion as follows:

According to parents, [Mother] arrived with [Jane] at the DHS office on 08/10/95 a little after 3:00 p.m. for [Father's] supervised visit with their daughter. Parents apparently waited for about 15–20 minutes in the waiting area (which is the authorized waiting area for parents until visitation supervisor from CPS Outreach Program shows up). The visitation supervisor later informed the DHS [Social Worker (SW)] that she did not come to supervise the visit because [Mother] did not confirm the visit the day before. She was at her office that afternoon working on reports and had already left by the time that [Mother] called their office a little before 4:00 p.m. Parents stated that since the supervisor did not show up, they accepted the offer of the security to go into a private visitation room. They did not inform the security that they were given strict instructions by the DHS SW to wait in the waiting area and that they were to abide by probation and protective court orders. [Mother] stated that she breastfed the baby in the room with [Father], but that for the most part, she stood in the doorway of the room with the door open and [Father] was in the room. In talking separately with [Father], he stated that after they went to the private visitation room, he was in the room and [Mother] stayed in the doorway with the door open. The DHS SW asked him where the infant was and he replied that she was being held by [Mother] the entire time. When confronted by the DHS SW that they had all been in the private room together without any supervision at all during the while mother breastfed the infant, he stated, "Oh, yah, yah." He denied any other contact with the child. Mother denied any other incident. In further follow up with DHS staff

members, the DHS SW was informed that [Father] was observed by staff to be directly feeding and/or holding the baby without any authorized visitation supervisor present. [Mother] and [Father] have *repeatedly been told in person, at [the family court], by telephone, at the DHS office, by the Probation Officer and DHS SW, and in written form that [Mother] is not an authorized supervisor of visit between [Father] and any minor children.* Even after repeated questioning by the DHS SW, both parents omitted the fact that [Father] had direct access to the child in a private room without any authorized supervision. When confronted by the DHS SW in an office meeting with the GAL present on 08/17/95, both parents' initial reaction to the situation was to continue to blame lack of understanding of the orders, lack of clarification of the visits, and the security guard for offering them the room. Most of the parents' energies, especially [Mother's], was to place blame elsewhere and minimize the situation.

. . . .

On 08/14/95, [Mother] was contacted by DHS SW Robert Sanchez in consultation with this DHS SW [Kawaji]. She was informed that the DHS had decided to place [Jane] into Foster Care. She stated that she made only one mistake and should not be punished. Again, she fails to accept responsibility for her poor judgement [sic] and minimizes the situation. *This "mistake" is part of a continued pattern of behavior that [Mother] has engaged in for the duration of CPS involvement with her family over the past 10 years.*

(Emphases in original.)

At an August 29, 1995 hearing on DHS's motion for immediate review, Mother's counsel argued that what happened at the CPS office on August 14, 1994 did not warrant a revocation of family supervision. Mother's counsel explained that when Mother and Father were in the DHS waiting room, awaiting the arrival of the aide who was supposed to supervise the visitation, Jane got hungry and Mother asked a security guard where she could go to nurse Jane. After being directed

by the security guard to a private visitation room, Mother and Father went to the room and Mother breastfed Jane. Because the aide still had not arrived after Jane was fed, Mother went out of the room to ask the security guard where the aide was. At that point, it was determined that the aide wouldn't be coming, so Father left. Mother's counsel argued that although Mother and Father now realized that they should have advised the security guard of the temporary restraining order (TRO) against Father, it was understandable that with Jane crying to be fed, Mother being directed by a DHS security guard to a private room to feed Jane, and the presence of other DHS staff and clients in the area, Mother and Father would not realize that the TRO would be violated by Father being present in the private room with Jane.

Following the hearing, the family court revoked its prior award of family supervision, awarded DHS "foster custody" over Jane, and ordered that a service plan and agreement (service plan) between DHS, Mother, and Father, dated August 21, 1995,[17] be im-

**17.** The Service Plan and Agreement (the service plan) between DHS, Mother, and Father, dated August 21, 1995, stated that its goal was "to reunify [Jane] with her mother and/or father, if deemed appropriate, in a safe, stable, and nurturing family home." The service plan listed the following as objectives of the service plan:

A. LEARN AND DEMONSTRATE ADEQUATE PARENTING AND DISCIPLINE SKILLS.
B. DEVELOP AND DEMONSTRATE ADEQUATE SELF ESTEEM AND SELF–SUFFICIENCY SKILLS.
C. IMPROVE AND DEMONSTRATE ADEQUATE CHILD–PARENT BONDING AND ADEQUATE COUPLE/FAMILY RELATIONSHIPS.
D. DEVELOP AND DEMONSTRATE AN UNDERSTANDING OF THE DYNAMICS OF SEXUAL ABUSE AND ITS EFFECTS ON FAMILY FUNCTIONING AND INDIVIDUALS.
E. DEVELOP AND DEMONSTRATE AN UNDERSTANDING OF THE IMPACT OF DOMESTIC VIOLENCE AND CHILD ABUSE ON FAMILY INDIVIDUALS AND FUNCTIONING.
F. MAINTAIN AN ABUSE AND VIOLENCE FREE LIFESTYLE AND FAMILY HOME.
G. IMPROVE COMMUNICATION SKILLS AMONG FAMILY MEMBERS.
H. MAINTAIN A SAFE, STABLE, AND NURTURING FAMILY HOME.
I. DEVELOP AND DEMONSTRATE ADEQUATE USE OF A SOCIAL SUPPORT SYSTEM.
J. LEARN AND DEMONSTRATE AN ADEQUATE UNDERSTANDING AND ABILITY TO MEET THE MEDICAL, PHYSICAL, EMOTIONAL, EDUCATIONAL, AND PSYCHOLOGICAL NEEDS OF THE CHILDREN IN A TIMELY MANNER.

The service plan imposed numerous and detailed obligations on Mother, including the following:
1. Participate in a supplemental Psychological Evaluation if recommended by the CPS Team and arranged by the DHS [SW].
   a. If unable to keep appointment, client must call the DHS [SW] 48 hours in advance.
   b. If client fails to keep appointment, client will show cause to court at the next scheduled hearing as to why client should not be held in contempt.
   c. Comply with recommendations of evaluation.
   d. If client fails to show up for the evaluation, client will be responsible for no-show fee.
2. Participate in individual/joint/group counseling as recommended until clinically discharged by the designated therapist/facilitator.
   *[Mother's] diagnosis is Dependent Personality Disorder.... Without treatment, children are at risk for similar abuse re-occurring.*
   a. Focus of therapy:
      1) To understand the dynamics of sexual abuse and its effects on the family and family functioning.
      a) To apologize for the harm and threatened harm; heal family relationships.
      b) To prevent the reoccurrence of further abuse and/or neglect to self and children....
      c) To identify and acknowledge problems in choice of partners and how this puts self and children at high risk for future harm.
      d) To develop a family safety plan to insure family reunification in a safe, stable, and nurturing home.
      2) Explore own issues of abuse as a child and as an adult....
      3) To learn and develop adequate and appropriate parenting and discipline skills....
      4) To develop and demonstrate honest and open communication skills.
      5) Learn and demonstrate appropriate skills in: problem solving, conflict resolution, decision making, and coping.
      6) Anger management.
      7) Stress management
      8) Develop an awareness of the effects of domestic violence and child abuse on family functioning and family individuals.
      9) To learn and understand the dynamics of co-dependency.
   b. Keep all appointments unless excused by the therapist/facilitator.
   ....
3. Participate in Adults Molested as Children (AMAC) support group as recommended by the DHS SW.

plemented. Mother and Father were permitted reasonable supervised or unsupervised visitation with Jane at the discretion of DHS and the GAL. The family court also ordered that the parties appear at a Review Hearing on February 29, 1996 and that DHS provide Mother visits with Jane at least four times a week.[18]

### F. Jane's Return to Mother Under Family Supervision

On December 12, 1995, Mother filed a motion for an early review hearing to authorize family supervision and the return of Jane, as well as Sons 1, 2, and 3 and Daughter 2, to Mother. Attached to Mother's motion were three exhibits that Mother claimed documented that she was in substantial compliance with the service plan. On December 20, 1995 the family court entered an order granting in part and denying in part Mother's motion for an early review hearing.

. . . .

4. Cooperate with Homemaker, Homebuilder Family Therapist, out-reach worker, paraprofessional, social worker, and other designated child welfare worker to learn appropriate parenting and discipline skills and age-appropriate expectations.

. . . .

5. Cooperate and participate in medical/dental, educational, and mental health services for the child as requested and deemed appropriate.

. . . .

7. Keep all scheduled appointments with DHS SW and/or inform the DHS SW of any problems in compliance with the service plan.

8. Notify the DHS SW within 48 hours of any significant changes in their situation; i.e., residence, telephone number, employment, household composition, etc.

9. Allow DHS and GAL to share pertinent case information ... with all service providers.

10. Visit with the child as arranged by the DHS and cooperate with providers of visits. . . .

   a. *Supervised* by DHS, GAL, or other designated and authorized person.

   b. 1) All visits with the DHS must be confirmed the working day prior to the visit. . . .

   2) The visit will be canceled without a confirmation. If you are more than 15" [sic] late on the day of the visit, the visit will be canceled.

   c. *Conditions/Responsibilities*

   . . . .

   4) Learn and demonstrate adequate parenting and discipline skills.

   5) Abide by visitation guidelines.

Pursuant to the order, Jane and Son 1 were to be returned to Mother under family supervision by December 29, 1995, provided that Mother participated in a number of services. The family court also ordered, however, that foster custody of Sons 2 and 3 and Daughter 2 be continued. On December 27, 1995, Jane was returned to the family home under DHS "family supervision."

### G. The Continuation of Family Supervision

At the next four review hearings held on February 29, 1996, August 1, 1996, January 17, 1997, and July 8, 1997, the family court ordered the continuation of family supervision over Mother, Jane, and Son 1.

The reports by Jane's GAL and a DHS SW that were filed prior to these review hearings all indicated that Jane was happy, healthy, active, and not experiencing any ser-

6) Notify the DHS SW of any problems in complying with visitation guidelines.

. . .

11. Abide by any and all court orders, probation orders, and protective orders.

. . . .

12. If appropriate, apply for child care for protective reasons and cooperate with child care licensing worker to continue to receive child care services.

13. Cooperate with Income Maintenance Worker and Child Support Enforcement Agency Worker.

The service plan also included a section entitled "Consequences," which informed Mother that her parental and custodial duties and rights in "the children who are subject of this service plan" may be terminated by an award of permanent custody if Mother failed to comply with the terms and conditions of the service plan.

18. The record reflects that on September 5, 1995, Mother filed a Motion to Enforce Order for Immediate Visitation with [Jane], pointing out that after attempting unsuccessfully to schedule her court-ordered, four-times-a-week visitations with Jane so she could keep breastfeeding Jane, she was informed that the earliest she could visit with Jane was the week of September 11, 1995, over three weeks from the removal of Jane from Mother's care and custody. At a hearing held on September 12, 1995, the family court granted the motion and ordered Mother and DHS to work out an acceptable visitation schedule. On October 27, 1995, the family court entered a written order granting Mother's motion that set a schedule for Mother to visit with Jane four times a week.

ious developmental delays, except for a motor skills problem and a stiffness in her gait for which she was receiving weekly treatments. Additionally, it was reported that Mother was appropriately caring for Jane, both Mother and Father were attending the different therapy sessions they had been ordered to attend, the family dynamics had improved, and the parents had been making slow and positive progress towards the goal of providing a safe home for Jane and her half-siblings. Concerns were expressed, however, about whether Mother would ever be able to completely protect Jane from predatory behavior by Father and "reach an adequate level of understanding to reunify with her younger children." A concern was also expressed that five children were too many for Mother to adequately parent. Because of these concerns, Jane's GAL stated that the "DHS will have to decide whether or not they want to close this case or continue to supervise [Mother's] progress in [Adults Molested as Children] and other types of services. If their position is that [Mother] will never be able to keep her female children safe from potential sexual predators, then they must make that position known and move forward with a permanent plan for [Jane]."

Among the exhibits offered into evidence at the January 17, 1997 hearing were two letters from Katherine Green (Green), a clinical therapist at Kahi Mohala outpatient clinic, in which Green stated that Mother had attended eighteen individual therapy sessions, participated actively and cooperatively in individual and couples therapy with Father, and "understands the need to provide safety in the home for her children in terms of physical and sexual abuse." Green also offered the following assessment of Mother's progress in therapy:

> [Mother] has been working to her capabilities to improve her skills and knowledge as a parent. She is sincere and motivated to maintain safety in her home for her children and understands what is necessary to do so. There are no indications that she is suffering from problems with substance abuse, denial, paranoia or even clinical depression that would cause her to act irresponsible [sic] as a parent. The concerns

[Mother] presents in therapy sessions are genuine fears regarding losing her children to the system. She states she is following the rules and expectations set for her by CPS which includes attending individual therapy, couples therapy and parenting meetings. However, she feels others are not giving her credit for making "progress" and has become rather distraught about what more she needs to do to prove her worth as a mother. [Mother's] goals are simple and appropriate, and that is to have her family back together. I believe that it would be detrimental to [Mother's] hopes, trust, self esteem and future productivity to be denied of the opportunity to parent her children following her extensive participation in treatment requested by CPS.

> It is my recommendation that [Mother] be given at least a trial period to demonstrate her abilities to care for her children. This may be full time for a certain period or with long term visits such as extended weekends, where family dynamics can be assessed and monitored. Overall, I feel [Mother] should at least have the opportunity to take on the responsibility of her children, before consideration of any permanent removal is made.

A Safe Family Home Report, dated June 19, 1997, prepared by a DHS SW and offered into evidence at the July 8, 1997 hearing, noted that Jane "is obviously bonded to her mother and is an active child." The report expressed concern, however, about Mother's parenting style:

> The in-home service providers consistently report that [M]other's style of parenting is often one of "restraint," meaning that she tends to use the crib and/or high chair as a babysitter. She tends to prefer "boxing-in" [Jane] to make it easier for her to parent [Jane] and needs to be encouraged to allow the child to explore and get around, even if it means that [M]other must be a more active and interactive parent. The DHS SW has received several reports from supervised visits stating that even during these visits, [M]other has difficulty supervising all the children, and at times, seems unaware and/or unable to

recognize and address safety issues in a timely and/or consistent manner.

The Public Health Nurse (PHN) reported that there is not a lot of eye-to-eye contact between [M]other and [Jane], and that she does not do much "talking" with [Jane]. . . .

. . . .

. . . At this time, overall, it appears that [M]other is meeting [Jane's] needs, but there continues to be concerns as to how she will parent [Jane] as she gets more and more active in her toddler years and if she truly can provide her daughter with the much needed age-appropriate stimulation and structure to meet the child's changing and growing needs.

### H. *The Revocation of Family Supervision and Placement of Jane in Foster Custody*

On September 16, 1997, Jane was placed in foster custody after a DHS SW arrived at Mother's house with police officers and found Jane alone with a teenager named "Ann," who had not been identified as a member of the household or an approved caretaker for Jane. Thereafter, on September 25, 1997, DHS filed a Motion for an Immediate Review Hearing to Revoke Family Supervision and Award Foster Custody to DHS.

According to the Safe Family Home Report, dated September 22, 1997, that was attached to the motion, Jane was placed into foster custody on September 16, 1997 "as a result of [M]other's failure to comply with services for the child, her inconsistency with therapy services, lack of appropriate supervision of the child, neglect, and threatened harm."

At the hearing on DHS's motion on September 30, 1997, Mother's counsel represented that he had discussed the matter with Mother, and although Mother did not agree with everything written in the report and had brought her personal calendar to Kawaji to demonstrate that she had substantially complied with requirements that she participate in certain services, she was willing to have foster custody continue "with the understanding that—that at some point she can ask for a[sic] early review if—if it's appropri-

ate." Accordingly, the family court ordered that the foster custody of Jane assumed by DHS on September 16, 1997 be continued, with parents allowed reasonable supervised visitation with Jane at the discretion of DHS and the GAL. The parties were ordered to appear at a review hearing on January 22, 1998.

### I. *The Motion for Order Awarding Permanent Custody*

On October 24, 1997, DHS filed a Motion for Order Awarding Permanent Custody and Establishing a Permanent Plan. The motion sought

an order revoking the existing service plan and revoking the prior award of foster custody, awarding permanent custody to an appropriate authorized agency, which permanent custody order will terminate parental and custodial duties and rights, and establishing a permanent plan relating to [Jane], which plan will propose adoption or permanent custody for the child until subsequently adopted or the child attains the age of majority.

At the hearing on DHS's motion on November 4, 1997, DHS requested that this case be consolidated with CPS Case No. 2 (involving Sons 1, 2, and 3, and Daughter 2) and that trial for the consolidated cases be set. The family court thereupon ordered the continuation of foster custody and the existing service plan, set the matter for a Judicial Pretrial Assistance (JPA) mediation on December 18, 1997, and scheduled trial for March 18, 19, and 20, 1998.

At a February 26, 1998 pre-trial conference, Mother agreed to allow DHS to assume permanent custody of Jane's half-siblings, Sons 1, 2, and 3, and Daughter 2, thereby giving up her parental rights to those children. Following the conference, the family court entered a written order that continued the previously ordered service plan and Jane's foster custody status, set aside the trial that had been scheduled for March 18, 19, and 20, 1998, and ordered the parties to appear at a review hearing on April 9, 1998. The order also stated that "DHS and GAL, in consultation with the therapists, Marjorie

Higa Funai (Funai) and Green, will consider return of [Jane] to Family Supervision and make efforts to effect reunification as soon as it is considered appropriate[.]"

### J. *The Evidentiary Hearing on DHS's Motion for Permanent Custody*

At the hearing on DHS's Motion for Permanent Custody held on July 9, 1998, seven witnesses testified, including Jane's GAL.

### 1.

Kawaji testified that Jane is a "special needs child" whose needs would make it difficult for an "average parent" to raise her. Additionally, Kawaji agreed that a "parent with deficits in parenting skills or knowledge [would] have a harder time raising a special needs child as compared to a parent working with a healthy child[.]" Kawaji opined that Mother would not be able to provide for the needs of Jane, who was exhibiting the same patterns of difficult behaviors and special needs as her older half-siblings, because Mother was not able to provide the "proper structure, stimulation, consistency in the family home[.]"

Kawaji recalled that at the time the Petition was initially filed, her concern was that Mother had been inconsistent or non-compliant in attending mental health, parenting, and other services she had voluntarily agreed to attend, and could not "care for [Jane] and be protective." A "major concern" at the time was that Mother

was not being honest in setting limits in her relationship with [Father] because at that time they were together.

She had been saying they're not together, they're together; they're not together and so that unclear status was a red flag for the Department and myself.

The fact that she was not willing to acknowledge the fact that [Father] has a sex abuse conviction was a concern for the Department.

Those were serious red flags at that time.

. . . .

The concern was that [Mother] has a dependent personality disorder. . . .

And although it says in partial remission again the concerns were that without consistent structure and monitoring what kind of choices [M]other may make and the concerns were that I could not trust that [M]other would abide by protective orders or restraining orders which became an issue in the following months.

Kawaji admitted that she "was not concerned that [Mother] would physically abuse the children[.]" Instead, the concerns regarding Mother were that

she would not be able to be protective of the children.

That she has a history of impulsive and/or poor choices in her partners as well as the child care providers that she chooses.

And—and again the . . . long and serious history and chronic pattern of neglect.

Kawaji also testified that although three years have passed since the Petition had been filed, Mother still was not able to provide Jane a "safe family home" because she lacked "commitment," "sticktoitness," and "the ability to just endure the trying times of a parent." According to Kawaji, Mother's deficits were

concerning because [M]other's parenting skills are minimal and [Jane's] special needs are so high. The gap is it is just that much bigger so that I'm seriously concerned about that.

And—and her lying just—about some real serious issues such as child care of the child that young makes me very, very concerned.

Her thinking that someone with a serious physical abuse history such as [Oldest Daughter's] father last summer would be an appropriate caretaker for the child.

That—that a teen could be an appropriate child care person for a child with high special needs.

Her attitude that I can be protective 'cause I'll keep her with me twenty-four hours a day. It just demonstrates to me an unrealistic and/or unrealistic parenting ideal or protection plan as well as continued inability to understand her concerns.

With respect to Mother's compliance with recommended services, Kawaji testified that DHS had referred Mother to home-based services for a year, parenting classes, therapy services, mental health services, and "all the services that we could within reason." The services were intended

to address [Mother's] own history of her own family of origin, her own sex abuse, physical abuse and psychological abuse concerns.

I would like for [Mother] to understand how her own abuse is not her fault but however that it affects—it does impact and affect her ability to parent her own children.

Perhaps [Mother] is not in denial about her own sexual abuse. She's about to talk about it now. Has found support in some people to talk about it.

But my concern is her inability to see that her choices continue to place her children at the same kinds of risks for harm.

So, in that sense I—I do have concerns but although she can articulate her own abuse that she is still unable to be protective 'cause she can't see the harm.

So, the therapy was the goal of helping her to address the issues of neglect, it's [sic] impact on children, her being able to see her role in the children's special needs and how perhaps not maliciously but unknowingly she has been a part of the children's problems, the behaviors and she should be able to accept responsibility for that as well as to be able to make better choices and judgments in her partners and her support system.

And to also be able to increase her own self esteem so that perhaps she can take better care of her own needs instead of always running herself thin because she's looking out for the needs of others, to decrease her stress level so that she can again better focus on her needs and perhaps then better be more empathic towards the children's needs, to develop empathy of the children.

Kawaji testified that although Mother had worked with the "home base service provider until that case was closed[,]" she had been only "in partial compliance, inconsistent with the visits that are provided to her." Additionally, Mother did not complete the parenting services she had been referred to until she was discharged from the program and given a "second try" to complete the services. With respect to the mental health services that Mother had completed or partially completed, Kawaji opined that Mother does "not have the insight to internalize what she's learned."

Kawaji's testimony about Mother's failure to comply with services, however, was somewhat at odds with the Safe Family Home Guidelines progress reports that she periodically submitted to the family court during the proceedings below. In a report dated February 29, 1996, for example, Kawaji reported partly as follows:

During this report period, [Father] and [Mother] have consistently attended Parents Anonymous Classes and are recommended for continued participation.

. . . .

[Mother] continues in individual therapy. She transitioned from Waianae Coast Sex Abuse Treatment Center to a private therapist, Barbara Porteus, Ph.D., around November 1995. Unfortunately, [Mother] failed to sign the necessary consents with Dr. Porteus until 02/23/96, so the DHS SW was not able to consult directly with Dr. Porteus. Dr. Porteus told [Mother] she could not share information until the consents were signed. . . .

[Mother] participated in services with the [Child and Family Services] Visitation Center and was recommended to begin unsupervised visits with the three children who are still in Foster Care at this time. These visits began this week.

A report dated July 29, 1996 that Kawaji submitted to the family court states that

[p]arents have participated in Psychological Evaluations. . . .

Mother has begun individual therapy with Dr. Stein at Kahi Mohala. [Father] has agreed to participate in on-going individual/joint/group therapy as deemed appropriate to support [Mother] in reunifying as a family unit.

Parents continue regularly [to] attend parenting classes with PARENTS.[19] They are recommended to continue these educational support classes.

(Footnote added.) In a report dated January 16, 1997, Kawaji stated that Mother "has been referred to therapy services with [Funai], ACSW,[20] of the CPS Team to address her family of origin issues as well as her Focus of Therapy issues. If and when deemed appropriate, [Funai] will address [a] couple [of] issues with both parents in therapy as well." Kawaji also reported that "[b]oth parents are willing to continue to engage in therapy services as recommended" and "[p]arents continue regularly [to] attend parenting classes with PARENTS." *See also* Report dated June 19, 1997 (stating that: "Mother's 'therapist Ms. Greene [sic] reported . . . that [M]other has been on time or early for her appointments and that their current sessions are about 1x/month' "; Mother "has regularly attended sessions with Kahi Mohala's therapy services" [but has failed to consistently engage in psychotherapy services, citing money as her reason]; and "Mother continues to engage in services for the child with the PHN, Waianae Coast Comprehensive Center, and other recommended service providers to monitor and assess the child's development and progress").

On cross-examination, Kawaji stated that she had referred Mother to Funai for therapy related to Mother's sex abuse issues. Kawaji admitted, however, that she had never "scope[d] out [Funai's] resume" and didn't know that Funai's "focus has been with children not . . . . necessarily with adults" and that Funai's "previous experience has been as administrator rather than as the—as a [sic] actual therapist[.]" When questioned whether she was aware that most of Funai's therapy sessions with Mother were aimed at identifying "who [Mother] is and what she wants to do if she didn't have her children rather than dealing with anything about sexual abuse or that type of thing," Kawaji testified that she didn't know "the specific nature of—of the actual therapy sessions."

Kawaji agreed that Funai had "moved on to another agency" in May but claimed to not know whether Funai's preoccupation with transitioning to her new job had made it difficult for Mother to get appointments with her.

2.

Funai was the next witness called by DHS. She testified that she first became involved with Mother in January 1997, when she began therapy sessions with Mother on "goals for herself, goals for her children, situations that would interfere with her abilities to reach goals." For example, they addressed Mother's inconsistency in attending therapy sessions, her excuses for not attending sessions, her failure to make appointments, and the length of time it took Mother to get motivated to achieve goals. Therapy sessions were not focused on delving into Mother's history as a sexual abuse victim because that subject was being addressed by Green. Instead, therapy discussions would delve into what goals Mother had and what she would do if she "didn't have the children." According to Funai, Mother's "idea was basically, 'Well, geez, I can't see myself without the kids because, you know, they're my primary objective to have the kids and take care of them.' "

In response to questions about Mother's ability to be "protective" of Jane, Funai stated:

I think she sees herself as being protective but protective only to, you know, in a way that it's kind of constricting.

For—and let me give an example of what I mean by that. When [Oldest Daughter] came home [Mother] realized she needed to supervise [Oldest Daughter].

And so what she would do was be with her twenty-four hours making sure that she was always there[.] And [Oldest Daughter] was . . . you know, sixteen going on seventeen, . . . an adolescent who, you know, needs, you know, some supervision. I mean, maybe a lot of supervision

---

**19.** From the record on appeal, it appears that "PARENTS" refers to "P.A.R.E.N.T.S," an acronym for "**P**roviding **A**wareness, **R**eferrals, **E**ducation, **N**urturing, **T**herapy & **S**upport."

**20.** It is not clear to us what the letters in "ACSW" stand for.

but also not constantly hovered over. I mean—and that's not protection, you know.

So, in that sense a lot of times she felt that she was protecting her but maybe not the most appropriate way of protecting. Funai said that it was difficult for Mother to come to Funai's office because "most often [Mother] would leave tearful because we would deal with issues about her, her behavior, her past, what she would want." When asked whether she had formed an opinion as to whether Mother could provide a safe home for Jane, Funai testified:

I believe that as much as [Mother] loves her children I think the every day responsibilities and the lack of follow through really prohibits her from being able to meet the needs of her children in terms of consistency, nurturing, you know, stability.

On cross-examination, Funai agreed with Mother's counsel that Mother was a "very caring person, caring to help others ... who loves her kids." When asked whether the fact that Mother would have to meet the needs of only Jane, rather than all of her children, would make a difference in her ability to provide more attention to Jane, Funai said it would "depend upon [Jane], what her needs are, where she's at in her development." However, Funai still had concerns because

[a] child needs consistency. They need stability. They need nurturing, you know.

In order to develop, to be, you know, a pretty grounded individual.

When I say I have concerns it relates to the fact of [Mother's] ability to be consistent, okay?

She starts off very enthusiastically and somewhere down the road she gets side tracked, you know. Whether it be in other relationships, in other situations and because she's so kind and caring she takes in everybody into her life—

. . . .

... I think it would be really difficult for her to change that aspect of her personality.

And then just focus on [Jane] ... [and] what her needs are.

In response to further questioning, Funai reiterated that during the last few months of her therapy practice, Mother had been pretty consistent in keeping her appointments with Funai and was coming in two to three times a week. With respect to Mother's inconsistency in keeping her appointments prior to that time, Funai agreed that she had no reason to question Mother's explanations (no money for gas, car trouble, or illness of her children or herself) for missing appointments. In fact, on one occasion, Mother kept her appointment when she was obviously sick and Funai had to tell her to go home.

Funai also conceded that Mother had a pretty full plate, trying to do all that was required of her under the service plans. Indeed, because Funai did not want Mother to get "overwhelmed" by going to all the appointments she was required to keep, Funai tried to accommodate Mother by scheduling appointments on the same day as Mother's appointments with other therapists or service programs in the same area, so that Mother would not have to go to Honolulu from Wai'anae and back several times during the same day. Funai also agreed that after she left for a new job in May 1998 and therefore had to terminate her therapy services with Mother, she referred Mother back to Kawaji "to see what [Kawaji] wanted to do."

3.

Gayle Kim (Kim), a nurse who had been providing public health services to Mother since 1992, was DHS's next witness. Kim testified about her home visits to Mother's home, as well as the first foster home that Jane had been placed in, and also discussed Jane's development. She testified that in Jane's first foster home, Jane was "having a lot of behavior problems. She would end up having tantrums[,] ... for long periods of time, thirty minutes which seemed pretty extreme." Kim testified that during her visits to Mother's home, she observed Jane having a temper tantrum "[m]aybe once or twice" when Jane was told not to do something. Mother's response was to "try to hold [Jane] really tight and tell [Jane] firmly, 'No' you know, but not, you know, not too much

extremes in terms of her tantruming during the visits."

When asked if she had an opinion as to Mother's ability to provide for Jane, Kim testified:

Yeah, I could see that she could provide physically for [Jane]. That I think she was dressed well a lot of time [sic] when I would make visits, a lot of material things were provided for her, toys and dresses, shoes, things like that.

She appeared to be fed and she would generally take her into the doctors whenever she was ill. Except for the two year old physical she was pretty much on time with the physicals.

But I think in looking back there were times when I was—I wasn't too sure in terms of the nurturing part of the relationship, the emotional needs of the child, to be able to respond to her and to nurture her.

When she was an infant she was very affectionate with [the] baby but I guess as the baby became more active, you know, it was more a matter of containing her than—than, you know, responding to her and responding to her needs emotionally.

On cross-examination, Kim testified that in her experience with Mother, there was no indication that Mother was abusing Jane. She had also not seen any neglect of Jane by Mother. Kim also agreed that she "really [didn't] have a concern that [Mother would] be able to provide a safe home." Her concern was more that Mother "didn't seem to be able to nurture [Jane] as much as [Kim felt] might be appropriate" or "see when there were—there may have been problems within . . . of her behavior as well as problems with her other children as they were growing up." Kim admitted, however, that with the assistance of people like herself, who could "sort of key [Mother] in to [developmental] problems" that Jane might be experiencing and provide parenting instructions and education, Mother's deficits in this area could be addressed. Finally, Kim testified that Mother "loves her child."

**4.**

Laura Chun (Chun), an outreach worker for Catholic Charities, testified that she first began working with Mother, Father, and Mother's family in August 1995. Chun provided weekly supervision for Mother and Father during their supervised visits with Jane and also provided transportation for the visits. Chun testified that as Jane grew older, Jane had frequent tantrums that were, to a degree, severe. Chun said she had concerns about the way Mother dealt with the tantrums because Mother had a "more laid back parenting style and [was] not as pro-active as she could have been" in dealing with Jane.

Chun confirmed that during the visits, which were for one hour a week, she had never seen "any outward signs of physical abuse or neglect" or "any suspicious bruises or markings. [Jane] always came to the visits clean and clothed." Additionally, Chun testified, her observation was that Mother "was affectionate . . . and she seemed to care about [Jane]." There was also bonding between Mother and Jane, and Mother seemed "capable of providing for the basic physical needs of [Jane]." Chun's concern related more to whether Mother could maintain a structured enough environment to provide the needed consistency and discipline to control Jane's behavior. Also, she had concerns about whether Mother could take Jane to her appointments on a regular basis.

Chun believed that Mother could have been a "better parent" and was concerned because during the time Chun had worked with Mother, "there was very little progress" in that Jane "still continued to have the same behavior problems."

**5.**

Jane's GAL since November 1997[21] was also put on the stand and questioned by the parties. He testified that he was not concerned about Mother "re-abus[ing] or re-neglect[ing]" Jane. Instead, he was concerned that Mother "didn't comply with some of the requirements of the service plan . . . and make due progress." The GAL confirmed that Mother had voluntarily sought

---

**21.** Jane had a previous GAL who withdrew when she took a job on a different island.

treatment with Green for sexual abuse issues, that Mother and Jane appeared to be bonded and communicating with each other, and that the home environment appeared to be clean and well taken care of. The GAL also confirmed that outreach services by Kim were terminated in September 1997, services by Chun ended in March 1998, and that although Funai had known since February 1998 that she would be leaving for a new job in May 1998, no arrangements were made by DHS to obtain a replacement therapist for Mother.

### 6.

Mother testified that the day after she had given birth to Jane, a CPS worker came to the hospital and had police "book" Jane and take her away. Mother was told that DHS "got an anonymous report that some kind of harm was gonna happen to [her] baby." Mother pointed out that no one had bothered to go to her house or to Father's house to investigate the anonymous report; if they had, they would have seen that her home, not Father's home, was prepared for the baby.

Mother testified that Jane was returned to her on July 27, 1995, but as a result of an incident that occurred at the CPS office, Jane was again removed from Mother on August 14, 1995. Mother explained that she had gone to the CPS office for a supervised visit so that Father could see Jane. Frank, a CPS aide, was in the room, as well as Father. Mother went to inquire what was taking so long to get the visit underway since she had not heard from anybody, then "went back in the room and ... was breast feeding Jane right outside by the door." According to Mother,

> there was [sic] people walking back and forth. The security guard from in there told us that we can go in the room. I wasn't think—honest, I wasn't thinking anything wrong. I did that mistake by going in the room.
>
> So, Father was sitting like across and I was sitting by the door and then Frank came in by the door 'cause I was talking with him 'cause I was sitting by the door breast feeding my baby.

Mother testified that she also talked to Penny, another DHS aide who was present, and was never told by either Frank or Penny that she was doing anything wrong. When it was determined that the aide who was supposed to supervise the visit was not showing up, Father left the premises and never had his visit with Jane. It was only after Father left that Penny told Mother that "[they were] not supposed to be in the same room together." Two days later, DHS came to Mother's home and "called the cops," who had Jane removed.

Mother testified that Jane remained in foster custody until December 27, 1995 and then "[t]he Judge gave me a chance with her."

Mother described her hectic schedule in carrying out the court-ordered service plans involving Sons 1, 2, and 3, Daughter 2, and Jane. She had to "[s]ee [Funai]. See the therapist at Kahe [sic] Mohala and [take] the baby to the doctor and take it to PCDC." [22] Mother was also attending school because it was a mandatory requirement for collecting welfare benefits. Additionally, she had visits with "all the kids" on Mondays, and with Son 1 and Jane on Fridays. Her visits with Green were weekly initially, then twice a month, and then once a month. The sessions with Green focused on dealing with sex abuse issues involving Mother's past history, such as "what's going on with the CPS and [Mother's] children" and "what happened between [Mother] and [Grandfather], the sex abuse[,] what happened to my daughter and—and my boy's father, the twins, and [Son 1]."

According to Mother, the sessions with Funai focused on getting Mother to think about who she was, what she desired, and what she wanted to make of herself. Mother stated that because she "ha[d] kids and ... was going to school at the same time and ... trying to make ... something of [her]self[,]" which is why she "was going to school to get [her] [General Educational Development (GED) certificate] and trying to look for work[,]" she had a hard time explaining to Funai that she could not, as Funai requested, "put [her] kids on the side[,][t]hink of it like

---

**22.** It is not clear to us what the letters "PCDC" refers to.

[she] didn't have any kids ... [a]nd concentrate on ... [her]self."

Mother testified that Jane was taken away from her again on September 15, 1997. That morning, according to Mother, she had taken Jane for a "[WIC][23] appointment" to get Jane's height, weight, and growth development monitored. She also took Son 1 to see Dr. Pervis and to pick up some "Ritalin," a medication that Son 1 took for his attention deficit disorder. Upon returning home, Mother left Jane with Mother's brother; Ann, who was "a girlfriend"; and Rose, a neighbor. Mother then dropped Son 1 off at his school and went to her own school to take her final GED test. During the test, Mother got an emergency phone call from Ann, who was scared, informing Mother that people were banging on the door. Mother said she instructed Ann not to let anyone in the house, then went straight home. By the time she arrived home, Jane had already been taken away to the Waianae Comprehensive Center.

Mother testified that she always made sure that Jane was fed, well-dressed, and clean, and gave Jane a lot of hugs and kisses. She also played with Jane, had toys for her, and even had a pamphlet from the PHN to help her work with Jane with certain educational toys; e.g., stacking blocks of the same color. Mother also nurtured Jane by reading books to her, and helping her to write and count numbers.

Mother observed that after Jane was taken into foster custody by DHS in September 1997, Jane began to exhibit changes in her behavior. Of special concern and embarrassment to Mother was Jane's behavior when Jane had to leave after a visitation with Mother. Jane "would kick her feet up in the air and start screaming," cry and bang her head against the car seat, tell Mother "she wants to come home," not let go of Mother's hand, hold on to the door, and shut the door so that she could go home with Mother. The DHS aide would bring candies to bribe Jane and calm her down. Mother testified that she had been seeing Jane twice a week, but the month after her last court hearing, she missed a Friday visit when she was out

looking for a job and filling out job applications because Funai had told her she should. By the time she called DHS to confirm her Friday visit, it "was too late to call, [so] my visit[ ][was] already cancelled." Thereafter, Mother testified, her Friday visits were canceled, and Kawaji informed her that "it was very important that [she] go to [her] Monday visits with [Jane]."

With regard to her required therapy services, Mother testified that she was given two weeks' notice by Funai, with whom she had been meeting about three or four times every month, that Funai was leaving for a new job. Mother was never told whether therapy would continue with someone else. By that time, all other therapy services had "gone by the way side [sic]" and the only therapist Mother was seeing was Green.

Concerning her relationship with Father, Mother testified that she had broken up with him permanently and only called him so that he could talk to Jane on the telephone. She broke up with him because she realized that as long as she was with him, she would not be able to have the kids.

On cross-examination, Mother admitted that she had been diagnosed with a dependent personality disorder. However, she testified that she was only eighteen years old, a teenager, when she had taken the test upon which the diagnosis was made; she is now an adult.

Mother testified that she had never worked or really had a job because she was taking care of her children. She also could not look for a job because a job would interfere with performing the services she was required to under the service plan.

Regarding her ability to protect Jane, Mother testified that she had never left Jane alone with Father and that Jane was "already afraid of [Father] because she hasn't been around men."

**7.**

Father was the final witness at the hearing. He testified that he had never seen Mother hit or abuse her kids or be mean to

23. According to Mother, "WIC" refers to the "Women Infants Children" program.

them, and she always fed them. He had also never been alone with Jane. Father testified that Mother should get Jane because "I know she's a good mother and I know she no abuse the kids and I know she don't hit her kids and I know she time out and stuff like that. I never seen her mean to her kids." Additionally, Mother never left the children unsupervised and never took drugs.

### 8.

In addition to the foregoing testimony, Mother offered, and the family court admitted into evidence, a letter from attorney Arlene J. Piper (Piper), the GAL for Mother's other children in the past as well as present CPS cases, with the qualification that Piper had not been part of Jane's case and had not had access to the files and records concerning Jane. The crux of Piper's letter was as follows:

> In both my capacity as GAL and personally, I have never observed [Mother] mistreat or abuse her children. She has always been a loving mother who has tried her best to take care of her children. I believe she has been thwarted in her efforts to comply with her Service Plan. It seems whenever she substantially complied with the requirements, DHS added more requirements or changed the demands in a manner that appeared geared to failure, as the specifics did not take into consideration [Mother's] background or situation.
>
> This whole case leaves me heartbroken. I think it is a sad commentary that the State could not use its resources to help this family stay together. For [Mother] to lose her only remaining child would be very unfortunate, as she does love all her children, and has fought so hard to keep this last child. I know my present ward, [Oldest Daughter], will be devastated to lose her one remaining sibling.

### K. *The Award of Permanent Custody Over Jane to DHS*

On July 31, 1998, the family court entered the Permanent Custody Order that: (1) revoked the prior award of foster custody over Jane to DHS; (2) divested Mother and Father of their parental rights in Jane; (3) appointed the Director of DHS as permanent custodian of Jane, with authority to delegate his/her responsibilities and duties to a professional member of the DHS staff; (4) awarded the Director of DHS "each of the parental and custodial duties and rights as are set forth in HRS § 587-2, 'Permanent Custody' and are stated in the Letters of Permanent Custody," a copy of which was filed concurrently with the family court's order; (5) excluded Mother and Father from participating in adoption or other subsequent proceedings involving Jane; and (6) ordered Mother and Father to appear at a permanent plan review hearing on February 5, 1999.

The Letters Awarding Permanent Custody to DHS vested in DHS, until Jane "reaches the age of eighteen or is ... adopted," the duties and rights of a legal custodian and family member, including the authority "[t]o provide consent to [Jane's] adoption, change of name pursuant to HRS § 574-5, or to marriage with prior [c]ourt approval[.]"

### L. *The Denial of Mother's Motion for Reconsideration and Mother's Appeal*

On August 18, 1998, Mother filed a motion for reconsideration of the Permanent Custody Order. The family court summarily denied Mother's motion on September 16, 1998.

This timely appeal by Mother followed on October 13, 1998.

### M. *The Family Court's Findings of Fact and Conclusions of Law*

On November 10, 1998, Findings of Fact and Conclusions of Law were filed by the family court. The family court concluded, in relevant part, as follows:

> 3. [Mother] ... [is] not presently willing and able to provide [Jane] with a safe family home, even with the assistance of a service plan.
>
> 4. It is not reasonably foreseeable that [Mother] ... will become willing and able to provide [Jane] with a safe family home, even with the assistance of a service plan, within a reasonable period of time.
>
> 5. The permanent plan dated October 15, 1997 is in the best interests of [Jane].

The findings of fact[24] that are relevant to this appeal by Mother and upon which the family court based its foregoing conclusions include the following:

### THE CHILD

. . . .

32. [Jane] was first placed in foster care on June 21, 1995.

33. [Jane] has been residing in the current foster home since December 1997.

34. [Jane] is a "special needs" child as demonstrated by the following factors: she often displays chaotic behavior when she is at visits; she has frequent, severe "tantrums"; she has borderline delays in development, and febrile seizures; she showed improvement in her speech and behavior after being placed out of family home.

35. The professionals involved in [Jane's] life have expressed grave concerns with the protracted nature of these proceedings and the negative psychological impact it is having on [Jane's] development.

36. [Jane] displays the same behavioral problems and difficulties that her older siblings did. The siblings have all gone on to develop further behavioral disorders such as: Attention Deficit Hyperactivity Disorder, toileting and hygiene problems, attachment disorder, defiant behavior, and impulsivity. [Jane's] future development would likely mimic the patterns and needs of the other children.

37. The behaviors that [Jane] exhibits and likely may develop in the future can be managed through structure.

38. Mother and Father cannot provide the structure or consistency needed to manage [Jane's] problems.

### MOTHER

. . . .

42. Mother was physically and sexually abused by [Grandfather], . . . from the age of ten until she was fourteen.

43. At the age of 15, Mother gave birth to her oldest child, [Oldest Daughter,] on October 30, 1981. Mother was involved in a relationship with [Oldest Daughter's] father . . . for about two years.

44. [Oldest Daughter] was sexually abused by [Grandfather] and [Legal Father].

45. Mother met [Legal Father] in 1985, and they married in 1986. [Legal Father] was an alcoholic and physically abused Mother prior to and during their marriage.

46. [Legal Father] is the father of [Son 1] and the twins, [Sons 2 and 3]. [Legal Father] physically abused all of the children, in addition to Mother. [Legal Father] also sexually abused [Oldest Daughter], for which he was convicted of criminal charges and deported to Western Samoa. [Legal Father] was not allowed to return to the United States until 1996, and has had no contact with the children since being deported.

47. Mother has been in an abusive relationship with Father since sometime in 1993.[25]

48. Although Mother finally has acknowledged the issues regarding her own physical and sexual abuse, she continues to have limited insight as to how those issues affect her judgment and ability to provide for her childrens' [sic] needs.

49. Mother still does not understand how the abusive relationship between herself and her partners, as well as the abuse her partners have perpetrated against all of their children and other family members, has a detrimental effect on [Jane's] physical and psychological well-being.

---

24. Findings of fact (FsOF) Nos. 1 through 24 detail the procedural history of this case; FsOF Nos. 25 through 30 describe the parties to this case; FsOF Nos. 31 through 38 are categorized as relating to "Child"; FsOF Nos. 39 through 67 relate to Mother; FsOF Nos. 68 through 84 relate to Father; and FsOF Nos. 85 through 98 are categorized under the heading "DHS."

25. We have been unable to locate any evidence in the record that would support this finding of fact. There is evidence that Mother was in an abusive relationship with Legal Father; however, the record also indicates that Legal Father was deported to Western Samoa, has remarried, and is no longer a threat to Mother's children.

50. Throughout this case, Mother has exhibited a pattern of alternating between insight and denial, compliance and non-compliance, participation and non-participation, improvement and regression, and insight and lack of insight into [Jane's] needs.

51. Mother has no insight into [Jane's] ordinary and special needs. Mother's parenting style is passive, and she tends to confine Jane to a play pen, crib, or high chair to "manage" her, rather than letting her be free to explore while monitoring her safety. Mother displays a lack of understanding and consistency in providing structure, guidance and discipline to [Jane], and continues to make poor choices regarding child care.

52. Mother frequently cancelled visits with [Jane] and her siblings due to illness, other appointments, or other personal obligations.

53. Mother was also inconsistent in attending therapy sessions, which impeded her ability to reach her goals.

54. Mother has never been employed, and has no training or education which would enable her to secure employment.

55. In a psychological evaluation administered by [Dr. Loo], Mother was diagnosed as suffering from Dependent Personality Disorder. This diagnosis negatively impacts Mother's ability to provide a safe family home for [Jane] because of difficulty in making independent decisions, tending to choose partners that are high risk, and exercising poor judgment.

56. Mother failed to follow directions that DHS felt were necessary to the well-being of all her children, despite repeated and clear instruction.

57. Mother agreed to discontinue her relationship with [Father] in order to have her children return to her. Despite her purported willingness to do so, Mother maintained a relationship with [Father], and fails to understand the detrimental effect on [Jane's] physical and psychological well-being.

58. Mother appears to have agreed to participate in services because she felt she was required to by the [c]ourt to effect reunification with her children, and not because she agreed with or understood the need for services and the benefits that would derive from them. Mother still has not recognized, acknowledged, or apologized for the harm to [Jane] or her siblings.[26]

59. Because Mother does not recognize or understand potential harm to [Jane], Mother is unable to be protective and will continue putting [Jane] at risk of threatened harm.

60. Mother and Father have not been open and forthright with the various service providers in this case.

61. Mother has not been honest regarding child care and the status of her living arrangements or personal relationships.

62. Mother and Father have failed to follow court orders despite having them explained in writing, and at court and by the social workers and various service providers. They continue to place blame on others for their own actions.

63. Mother has failed to show progress in any of the services she was ordered to attend, despite continual participation in those services for over 13 years. Mother has made only limited progress in therapy addressing her attachment, relationships, and her own abuse issues. While Mother is able to repeat and verbalize concepts she has learned in therapy and counseling, she appears unable to internalize those concepts and generalize them to apply them in practice.

64. The same problems still exist now that were present when the case was first opened. Mother had, and continues to have, limited ability and insight. Mother would always continue to require supervision and monitoring and it is unlikely Mother can or ever will benefit from further services in a meaningful way.

---

**26.** It is not clear to us what "harm" Mother was supposed to apologize to her children about. The record on appeal contains absolutely no evidence that Mother ever harmed Jane or any of her children.

65. Mother was given every reasonable opportunity to effect positive changes to provide a safe family home and to reunify with [Jane].

66. Mother is not presently willing and able to provide [Jane] with a safe family home, even with the assistance of a service plan because her foregoing problems continue to exist and she has refused, frustrated, and failed to benefit from the services which have been provided to her over the last 13 years.

67. It is not reasonably foreseeable that Mother will become willing and able to provide [Jane] with a safe family home, even with the assistance of a service plan because even if Mother were to suddenly change her long standing pattern of behavior, there is no likelihood that she would sufficiently resolve her problems at an identifiable point in the future.

(Footnotes added.)

## THE LEGAL FRAMEWORK FOR INVOLUNTARILY TERMINATING PARENTAL RIGHTS

### A. *United States Supreme Court Case Law*

The United States Supreme Court has characterized the "rights to conceive and to raise one's children" as "essential, ... basic civil rights of man, ... and rights far more precious than property rights." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (brackets, citations, ellipsis, and quotation marks omitted). According to the Court, a natural "parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference, and absent a powerful countervailing interest, protection.'" *Lassiter v. Department of Social Servs. of Durham County, N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (quoting *Stanley*, 405 U.S. at 651, 92 S.Ct. 1208).

When a state initiates a termination of parental rights proceeding, it seeks "not simply to infringe upon that interest, but to end it. If the State prevails, it will have worked a unique kind of deprivation. A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore a commanding one." *Lassiter*, 452 U.S. at 27, 101 S.Ct. 2153. In recognition of the importance of this parental interest, the Supreme Court announced in *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." The Supreme Court explained that

[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

*Id.* at 753–54, 102 S.Ct. 1388.

*Santosky* involved an appeal from a New York family court judgment terminating the natural parental rights of petitioners over their children, based on a finding that the children were "permanently neglected." Under the applicable New York statute, the termination of parental rights involved two stages: factfinding and disposition. The United States Supreme Court observed that the fact-finding hearing

pits the State directly against the parents. The State alleges that the natural parents are at fault.... The State marshals an array of public resources to prove its case and disprove the parents' case. Victory by the State not only makes termination of parental rights possible; it entails a judicial determination that the parents are unfit to raise their own children.

*Id.* at 759–60, 102 S.Ct. 1388. At this stage, the Supreme Court observed, the State must prove parental unfitness and "cannot presume that a child and his parents are adversaries." *Id.* at 760, 102 S.Ct. 1388. "[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." *Id.* It is only "[a]fter the State has established parental unfitness at that initial proceeding, [that] the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge." *Id.* at 760, 102 S.Ct. 1388. At that point in the process, the judge can select dispositional alternatives for the child based "solely on the basis of the best interests of the child." *Id.* at 760, 102 S.Ct. 1388 (quoting Fam. Ct. Act § 631).

In explaining why a higher standard of proof than the preponderance of evidence standard was required in termination of parental rights proceedings, the *Santosky* court observed that heightened procedural protections were necessary because the risk of error during the factfinding proceeding was magnified due to a number of factors:

Permanent neglect proceedings employ imprecise substantive standards that leave determinations unusually open to the subjective values of the judge. In appraising the nature and quality of a complex series of encounters among the agency, the parents, and the child, the court possesses unusual discretion to underweigh probative facts that might favor the parent. Because parents subject to termination proceedings are often poor, uneducated, or members of minority groups, such proceedings are often vulnerable to judgments based on cultural or class bias.

The State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense. No predetermined limits restrict the sums an agency may spend in prosecuting a given termination proceeding. The State's attorney usually will be [an] expert on the issues contested and the procedures employed at the factfinding hearing, and enjoys full access to all public records concerning the family. The State may call on experts in family relations, psychology, and medicine to bol-

ster its case. Furthermore, the primary witnesses at the hearing will be the agency's own professional caseworkers whom the State has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination.

The disparity between the adversaries' litigation resources is matched by a striking asymmetry in their litigation options. Unlike criminal defendants, natural parents have no "double jeopardy" defense against repeated state termination efforts. If the State initially fails to win termination, ... it always can try once again to cut off the parents' rights after gathering more or better evidence. Yet even when the parents have attained the level of fitness required by the State, they have no similar means by which they can forestall future termination efforts.

Coupled with a "fair preponderance of the evidence" standard, these factors create a significant prospect of erroneous termination. A standard of proof that by its very terms demands consideration of the quantity, rather than the quality, of the evidence may misdirect the factfinder in the marginal case. Given the weight of the private interests at stake, the social cost of even occasional error is sizable.

.... An elevated standard of proof in a parental rights termination proceeding would alleviate "the possible risk that a factfinder might decide to [deprive] an individual based solely on a few isolated instances of unusual conduct [or] ... idiosyncratic behavior." "Increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate" terminations will be ordered.

*Id.* at 763–65, 102 S.Ct. 1388 (citations omitted). In a footnote in *Santosky,* the Supreme Court observed as follows:

The Family Court Judge in the present case expressly refused to terminate peti-

tioners' parental rights on a "non-statutory, no fault basis." App. 22–29. Nor is it clear that the State constitutionally could terminate a parent's rights *without* showing parental unfitness. See *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978) (*"We have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest,'"* quoting *Smith v. Organization of Foster Families,* 431 U.S. 816, 862–863, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring in judgment)).

*Santosky,* 455 U.S. at 760 n. 10, 102 S.Ct. 1388 (emphasis added).

### B. *Hawai'i Statutory and Case Law*

In Hawai'i, two principal statutory schemes exist for involuntarily terminating the parental rights of a parent over his or her child.

27. HRS § 571–61 (1993) provides, in relevant part, as follows:

(b) Involuntary termination.
(1) The family courts may terminate the parental rights in respect to any child as to any legal parent:
   (A) Who has deserted the child without affording means of identification for a period of at least ninety days;
   (B) Who has voluntarily surrendered the care and custody of the child to another for a period of at least two years;
   (C) Who, when the child is in the custody of another, ·has failed to communicate with the child when able to do so for a period of at least one year;
   (D) Who, when the child is in the custody of another, has failed to provide for care and support of the child when able to do so for a period of at least one year;
   (E) Whose child has been removed from the parent's physical custody pursuant to legally authorized judicial action under section 571–11(9), and who is found to be unable to provide now and in the foreseeable future the care necessary for the well-being of the child;
   (F) Who is found by the court to be mentally ill or mentally retarded and incapacitated from giving consent to the adoption of or from providing now and in the foreseeable

### 1.

First, Part VI, entitled "Termination of Parental Rights," of HRS chapter 571, entitled "Family Courts," sets forth the procedures for the involuntary termination of parental rights. Part VI of HRS chapter 571 includes three sections: HRS § 571–61 (1993),[27] which sets forth the grounds upon which parental rights can be terminated, as well as the form, contents, and service required for a petition filed to involuntarily terminate parental rights; HRS § 571–62 (1993), which requires a hearing to be held on any HRS § 571–61 petition and allows an objective investigation and report to be completed regarding the circumstances of the minor and the parent or parents whose rights are sought to be terminated; and HRS § 571–63 (1993), which sets forth the requirements for a judgment of termination of parental rights.

In *Woodruff v. Keale,* 64 Haw. 85, 637 P.2d 760 (1981), a pre-*Santosky* case, the Hawai'i Supreme Court was called upon to determine whether the family court had properly applied HRS §§ 571–61 (1976 & Supp.1980)[28]

future the care necessary for the well-being of the child;
   (G) Who is found not to be the child's natural or adoptive father.

28. HRS § 571–61(b)(1) (1976 & Supp.1980) provided as follows:

(b) Involuntary termination.
(1) The family courts may terminate the parental rights in respect to any child as to any legal parent:
   (A) Who has deserted the child without affording means of identification for a period of at least ninety days;
   (B) Who has voluntarily surrendered the care and custody of the child to another for a period of at least two years;
   (C) Who, when the child is in the custody of another, has failed to communicate with the child when able to do so for a period of at least one year;
   (D) Who, when the child is in the custody of another, has failed to provide for care and support of the child when able to do so for a period of at least one year;
   (E) Whose child has been removed from [the parent's] physical custody pursuant to legally authorized judicial action under section 571–11(2)(A), and who is found to be unable to provide now and in the foreseeable future the care necessary for the well-being of the child;

through 571–63 (1976) in terminating the Woodruffs' parental rights in their natural child. The Woodruffs had allowed their infant daughter to be cared for by Jean Keale and her son John (the Keales) on the island of Niʻihau during the period that the Woodruffs resided on Guam and on Oʻahu between 1976 and 1978. After Mr. Woodruff was transferred back to Pearl Harbor in 1978, the Woodruffs located their daughter at the Keales on Kauaʻi and took her, purportedly for the day. When the Woodruffs did not return their daughter to the Keales, the Keales filed a petition in the family court for forfeiture and termination of the Woodruffs' parental rights.

The family court found that although the Woodruffs had the financial ability to do so, they failed to contribute to the support of their daughter during the entire period that the Keales had custody of her. The family court also evaluated the suitability of both home environments, evidence of parental behavior and temperament, and the court's own surmisals as to the daughter's future on Niʻihau. Concluding that termination of the Woodruffs' parental rights was in their daughter's best interest, the family court granted legal custody of the Woodruffs' daughter to Jean Keale.

On appeal, the Woodruffs contended, among other issues, that the family court violated their right to due process by concluding that termination of their parental rights was in their daughter's best interest without a specific finding of parental unfitness. *Id.* at 98, 637 P.2d at 768. The supreme court reversed and remanded. In doing so, the supreme court initially noted that

[b]efore a court may terminate the rights of natural parents in their children without the parents' consent, it must make two separate findings. First, the court must

be satisfied that at least one of the situations enumerated in HRS § 571–61(b)(1) exists. If it so finds, the court must then evaluate the evidence and determine that termination of parental rights would be "necessary for the protection and preservation of the best interests of the child concerned."

*Id.* at 89, 637 P.2d at 763. The supreme court disagreed with the Woodruffs that a "specific finding of parental unfitness *per se*" was mandated before a parent's rights could be terminated. *Id.* at 98–99, 637 P.2d at 769. However, the supreme court agreed that

in recognition of the constitutional protection afforded the parent-child relationship, ... *parents' rights must be considered—be it in the finding of parental consent, culpability or incapacity—before natural ties may be severed over their objections. In other words, parental rights cannot ordinarily be terminated for the sole reason that it would be in the child's best interest.*[29]

*Id.* at 99, 637 P.2d at 769 (emphasis and footnote added). The supreme court also noted that

Hawaii's statutory scheme facilitating the termination of parental rights [i.e., Part VI of HRS chapter 571] initially takes parents' rights and interests into account before turning to the child's. *In the case of involuntary termination, it is only after the parents have demonstrated some form of "unfitness" as defined by the legislature in HRS § 571–61(b) that the state intervenes as parens patriae and considers the best interests of the child. The statute thus gives proper regard to the rights of parents before allowing termination, consistent with due process principles.*

Moreover, parental fitness may certainly be one of the factors taken into account in

(F) Who is found by the court to be mentally ill or mentally retarded and incapacitated from giving consent to the adoption of or from providing now and in the foreseeable future the care necessary for the well-being of the child;

(G) Who is found not to be the child's natural or adoptive father.

**29.** In light of *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), decided

by the United States Supreme Court a year after *Woodruff v. Keale*, 64 Haw. 85, 637 P.2d 760 (1981), it is questionable whether parental rights can ever be terminated for the "sole reason that it would be in the child's best interest." There must be some finding of parental "unfitness" to allow natural parental rights to be terminated involuntarily.

determining the best avenue of action for the child. As we observed in *In re Mary Doe II,* "the concept of the best interests of the child is one that is without any measuring rod," 52 Haw. 448, 453, 478 P.2d 844, 847 (1970), relying on the wisdom and discretion of the family court. Although we previously refused to set out parameters of the "best interests" standard, *In re Mary Doe II,* supra, 52 Haw. at 453, 478 P.2d at 847, we note that the court may look to the past and present conditions of the home and natural parents so as to gain insights into the quality of care the child may reasonably be expected to receive in the future. Other factors for consideration may include the child's own desires and his emotional and physical needs. The court is given much leeway in examination of reports concerning the child's care, custody and welfare, and its conclusion, if supported by the record and not clearly erroneous, must stand on appeal.

*Id.* at 99, 637 P.2d at 769 (emphasis added, citations omitted). Finally, the supreme court discussed the burden of proof applicable in termination of parental rights cases under HRS chapter 571:

[B]ecause severance of the natural parent-child tie is such a drastic remedy, the burden of proving that such action would be in the child's best interest must rest with those seeking it. We now follow the lead of the Texas Supreme Court in *In re G.M.,* 596 S.W.2d 846 (1980), in suggesting that the "clear and convincing evidence" standard of proof govern such a determination. . . .

There is no question that the right to the integrity of the family unit is one of constitutional dimensions. . . . The very act of severing the parent-child relationship is cognizably absolute and irrevocable.

*Id.* at 100, 637 P.2d at 770.

■ Termination of parental rights under HRS chapter 571 thus involves a two-step process: first, one of the forms of parental unfitness set forth in HRS § 571–61(b) must be established by clear and convincing evidence; and second, the family court must determine, by clear and convincing evidence, that termination of parental rights is in the child's best interest.

### 2.

HRS chapter 587, the Child Protective Act, also provides a mechanism for involuntarily terminating a parent's rights. Specifically, HRS chapter 587 authorizes the family court to order a child placed in "permanent custody," a term described in HRS § 587–2 (1993), in relevant part, as follows:

"Permanent custody" means the *legal status created under this chapter by order of the court after the court has considered the criteria set forth in section 587–73(a) or (e) and determined by clear and convincing evidence that it is in the best interests of the child to order a permanent plan concerning the child.*

(1) *Permanent custody divests from each legal custodian and family member who has been summoned pursuant to section 587–32(a), and vests in a permanent custodian, each of the parental and custodial duties and rights of a legal custodian and family member,* including, but not limited to, the following:

(A) To determine where and with whom the child shall live; provided that the child shall not be placed outside the State without prior order of the court;

(B) To assure that the child is provided in a timely manner with adequate food, clothing, shelter, psychological care, physical care, medical care, supervision, and other necessities;

(C) To monitor the provision to the child of appropriate education;

(D) To provide all consents that are required for the child's physical or psychological health or welfare, including, but not limited to, medical, dental, psychiatric, psychological, educational, employment, recreational, or social needs; and to provide all consents for any other medical or psychological care or treatment, including, but not limited to, surgery;

(E) To provide consent to adoption, change of name pursuant to section 574–5, or to marriage;

(F) To provide the court with information concerning the child that the court may require at any time, and to submit written reports to the court stating the then-current situation and other significant information concerning the child at intervals not to exceed one year, unless otherwise ordered by the court; and

(G) If the child resides without the home of the permanent custodian for a period of seven consecutive days, to submit a written report to the court stating the then-current situation of the child on or before the tenth consecutive day or the next working day after the date;

(2) Unless otherwise ordered by the court, a child's family member shall retain, to the extent that the family member possessed the responsibility prior to the transfer of permanent custody, the continuing responsibility for support of the child, including, but not limited to, repayment for the cost of any and all care, treatment, or any other service supplied or provided by the permanent custodian, any subsequent permanent custodian, other authorized agency, or the court for the child's benefit;

(3) A family member may be permitted visitation with the child at the discretion of the permanent custodian; provided that the exercise of such discretion may be reviewed by the court and the court may order that a family member be permitted such visitation as is in the best interests of the child[.]

(Emphases added.)

HRS chapter 587 had its genesis in House Bill No. 1417, passed by the 1983 legislature and ultimately signed into law as Act 171, 1983 Haw. Sess. L. at 320. In explaining the underlying reasons for the bill, the House Judiciary Committee stated, partly, as follows:

The purpose of this bill is to create a new chapter to be designated the child protective act to safeguard, treat and provide permanent planning for children who have been harmed or threatened with harm.

Present law limits the jurisdiction of the court to those children who have been abused and neglected and does not offer protection to children who may be at risk, even within the same family. In instances of serious abuse to one child in a family, siblings are not afforded legal protection because the child's situation does not presently come within the jurisdiction of the court. Moreover, this bill seeks to clearly define the type of injury or harm which will bring a child within the jurisdiction of the Court.

Hse. Stand. Comm. Rep. No. 428, in 1983 House Journal, at 1030.

The system originally established by Act 171 was intended

to provide children with prompt and ample protection from the harms detailed herein, with an opportunity for timely reconciliation with their families where practicable, and with timely and permanent planning so they may develop and mature into responsible, self-sufficient, law-abiding citizens. *This permanent planning should effectuate placement with a child's own family when possible and should be conducted in a[sic] expeditious fashion so that where return to the child's family is not possible as provided in this chapter, such children will be promptly and permanently placed with responsible, competent, substitute parents and families, and their place in such families secured by termination of parental rights, adoption, guardianship, long-term foster custody orders, if no other option is available, by other order of the court, or arrangement as best provides for permanency.*

1983 Haw. Sess. L. Act 171, § 1 at 320 (codified in HRS § 587-1 (1985)) (emphasis added). The options available to the family court when it determined that a child could not be safely returned to the child's family were originally set forth in HRS § 587-72 (1985), which stated, in relevant part, as follows:

(h) The court may order permanency planning for the child as follows:

(1) That a petition for termination of parental rights pursuant to section 571-61 be commenced as soon as

practicable and that such petition be consolidated with the child protective proceedings;

(2) That a petition for guardianship pursuant to section 560:5–201 be commenced as soon as practicable, and that such petition be consolidated with the child protective proceedings;

(3) That if the child is sixteen years of age, and is of sufficient physical and psychological maturity, the court may order that the child be deemed to be emancipated and shall be regarded as though the child were of legal age . . .; or

(4) That the child shall remain in long-term foster care until the age of majority pursuant to a long-term foster care contract unless the child is emancipated prior thereto pursuant to paragraph (3) and that such status shall not be subject to modification or to revocation except upon a showing of extraordinary circumstances to the court.

In other words, as HRS chapter 587 was originally enacted, parental rights in a child could only be involuntarily terminated by (1) an order appointing a guardian for the child, (2) emancipation of the child, or (3) an order terminating parental rights pursuant to HRS § 571–61, which as discussed above, sets forth specific grounds of parental unfitness that can result in termination of parental rights.

Three years after Act 171 was passed, the legislature passed House Bill No. 2221–86, signed into law as Act 316, 1986 Haw. Sess. L. at 631, which totally revamped the statutory scheme of HRS chapter 587 and created a shortcut to the involuntary termination of parental rights process. According to the Senate Judiciary Committee, the purpose of the 1986 amendments was

to consolidate all of the statutory provisions designed to assure children a safe home environment, either with their natural families or in adoptive homes. The bill also adds specificity to existing statutory standards by providing clear guidelines for making the factual determinations that dictate placement decisions.

It is currently necessary to initiate separate legal proceedings to undertake supervision of a child's welfare and attempt to reunify the child's family, then to terminate parental rights, and finally to arrange adoption or guardianship. By integrating the several processes the bill eliminates undue delay and avoids an unsettling series of temporary placements for the child.

Sen. Stand. Comm. Rep. No. 537–86, in 1986 Senate Journal, at 1023.

To accomplish the legislative purpose for Act 316, several new definitions and sections were added to HRS chapter 587, and other sections of the chapter were modified.

For example, HRS § 587–1, entitled "Purpose; construction," was amended to add a finding that "children deserve and require . . . loving and nurturing homes" in addition to "safe and secure" homes. 1986 Haw. Sess. L. Act 316, § 1 at 631. Additionally, the Act amended the policy and purpose provisions contained in HRS § 587–1 that where return to a child's family is not possible, the child's place in a substitute family will be secured by (1) adoption, (2) termination of parental rights, (3) guardianship, (4) long-term foster custody orders, or (5) if no other option is available, by other order of the court, or arrangement as best provides for permanency, to delete references to items (2) through (5). In lieu of items (2) through (5), Act 316 added a provision that a child's place in a substitute family could be secured by "permanent custody orders." *Id.* As discussed above, "permanent custody" was defined as a legal status that divested parents of their parental rights.

Several new procedures of relevance to this case were also set in place by Act 316. First, a new section, HRS § 587–25, was added that established "safe family home guidelines" for determining whether a "child's family is willing and able to provide the child with a safe family home."

Second, a new section, HRS § 587–26, was added that provided for the preparation of a specific, written service plan that will set forth the steps necessary: (1) to facilitate the return of the child to a safe family home, if the proposed placement of the child is in foster care under foster custody; (2) for the

child to remain in a safe family home with the assistance of a service plan, if the proposed placement of the child is in a family home under family supervision; and (3) to make the family home safe, terminate the appropriate authorized agency's intervention into the family, and eliminate, if possible, the necessity for filing a petition with the court under chapter 587.

Third, a new section, HRS § 587–27, was added to require preparation by an authorized agency of a specific, written, "permanent plan" which would set forth, in relevant part: (1) a position as to whether the court should order adoption of the child; (2) whether the goal for the child should be adoption, permanent custody with subsequent adoption, or permanent custody until majority; (3) the objectives concerning the child; and (4) the method(s) for achieving the goals and objectives.

Fourth, a new section, HRS § 587–73, was added to provide for a permanent plan hearing at which the family court is required to determine whether there exists clear and convincing evidence that:

(1) The child's family is not presently willing and able to provide the child with a safe family home, even with the assistance of a service plan;

(2) It is not reasonably foreseeable that the child's family will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time which shall not exceed three years[30] from the date upon which the child was first placed under foster custody by the court;

(3) The proposed permanent plan is in the best interests of the child; provided that the court shall presume that:

(A) It is in the best interests of a child to be promptly and permanently placed with responsible and competent substitute parents and families in safe and secure homes; and

(B) Such presumption increases in importance proportionate to the youth

of the child upon the date that the child was first placed under foster custody by the court[.]

HRS § 587–73(a) (footnote added).

HRS § 587–73(b), as added by Act 316, also required that if the family court determined that the criteria set forth in HRS § 587–73(a) had been established by clear and convincing evidence, the court shall order:

(1) That the existing service plan be terminated and that the prior award of foster custody be revoked;

(2) *That permanent custody be awarded to an appropriate authorized agency;*

(3) *That an appropriate permanent plan be implemented concerning the child whereby the child will:*

(A) *Be adopted* pursuant to section 587–74; provided that the court shall presume that it is in the best interests of the child to be adopted, unless the child is in the permanent custody of family or persons who have become as family and who for good cause are unwilling or unable to adopt the child but who are committed to and are capable of being the child's permanent custodians; or

(B) *Remain in permanent custody until the child is subsequently adopted or reaches the age of majority,* and that such status shall not be subject to modification or revocation except upon a showing of extraordinary circumstances to the court[.]

1986 Haw. Sess. L. Act 316, § 30 at 663 (emphases added).

Under the HRS chapter 587 process, which is aimed at protecting children who have been harmed or threatened with harm, efforts are made to provide appropriate resources to help "the child's legal custodian to succeed in remedying the problems which put the child at substantial risk of being harmed in the family home." HRS § 587–1. A service plan is formulated to help the child's family provide a safe family home for

---

**30.** The three-year period set forth in HRS § 587–73(a)(2) (1993) for determining the reasonable foreseeability that a child's parents will become willing and able to provide their child with a safe family home was reduced by Act 153, Haw. Sess. L. 491, § 5 at 495, to a two-year period. HRS § 587–73(a) (Supp.1999).

the child so that the child can remain in or be returned to the family home. HRS § 587-26. Finally, if it is determined by clear and convincing evidence that the parents are unwilling or unable to provide their child with a safe family home, it is not reasonably foreseeable that they will become willing and able to provide their child with a safe family home, and it is in the child's best interests, a permanent custody order may be entered, forever divesting the parents of their rights in their child and freeing the child for adoption or guardianship. Thereafter, if the child is not adopted by age eighteen, the permanent custody order will terminate. A permanent custody order can thus place a child for whom no adoption is on the immediate horizon in a rather ambiguous situation.

## DISCUSSION

### A. *The HRS Chapter 587 Process to Involuntarily Divest Parental Rights*

The Petition in this case was brought pursuant to HRS chapter 587, not part VI of

**31.** In addition to these three criteria, HRS § 587-73(a) requires that where "the child has reached the age of fourteen," the family court shall also consider whether "the child is supportive of the permanent plan" in determining whether to enter a permanent custody order.

**32.** At the time of the proceedings below, HRS § 587-73 provided that a "reasonable period of time ... shall not exceed three years from the date upon which the child was first placed under foster custody by the court." This period has been changed so that it now does "not exceed two years from the date upon which the child was first placed under foster custody by the court." HRS § 587-73 (Supp.1999).

**33.** HRS § 587-25 provides as follows:
   **Safe family home guidelines.** (a) The following guidelines shall be fully considered when determining whether the child's family is willing and able to provide the child with a safe family home:
   (1) The current facts relating to the child which include:
   (A) Age and vulnerability;
   (B) Psychological, medical and dental needs;
   (C) Peer and family relationships and bonding abilities;
   (D) Developmental growth and schooling;
   (E) Current living situation;
   (F) Fear of being in the family home; and
   (G) Services provided the child;
   (2) The initial and any subsequent reports of harm and/or threatened harm suffered by the child;

HRS chapter 571. Unlike chapter 571, which delineates rather specific grounds for involuntary termination of parental rights (e.g., desertion of child for at least ninety days, failure to communicate with child for at least one year, failure to provide for care and support of child for at least one year, etc.), the HRS chapter 587 process requires the family court to make three findings before determining that divestiture of parental right can be ordered (the three-part test).

Pursuant to HRS § 587-73(a), a permanent custody order divesting a parent of his or her rights in a child who is less than fourteen years old [31] may be entered after a "reasonable period [32]" of time if the court determines, by clear and convincing evidence and after fully considering information pertaining to the safe family home guidelines,[33] that (1) the child's parents "are not presently willing and able to provide the child with a safe family home, even with the assistance of a service plan"; (2) it is not reasonably fore-

   (3) Date(s) and reason for child's placement out of the home, description, appropriateness, and location of the placement and who has placement responsibility;
   (4) Historical facts relating to the alleged perpetrator and other appropriate family members who are parties which include:
   (A) Birthplace and family of origin;
   (B) How they were parented;
   (C) Marital/relationship history; and
   (D) Prior involvement in services;
   (5) The results of psychiatric/psychological/ developmental evaluations of the child, the alleged perpetrator and other appropriate family members who are parties;
   (6) Whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the family home;
   (7) Whether there is a history of substance abuse by the child's family or others who have access to the family home;
   (8) Whether the alleged perpetrator(s) has acknowledged and apologized for the harm;
   (9) Whether the non-perpetrator(s) who resides in the family home has demonstrated the ability to protect the child from further harm and to insure that any current protective orders are enforced;
   (10) Whether there is a support system of extended family and/or friends available to the child's family;
   (11) Whether the child's family has demonstrated an understanding and utilization of the recommended/court ordered services designated to effectuate a safe home for the child;

seeable that the child's parents "will become willing and able to provide the child with a safe family home, even with the assistance of a service plan"; and (3) the proposed permanent plan for the child

will assist in achieving the goal which is in the best interests of the child; provided that the court shall presume that:

(A) It is in the best interests of a child to be promptly and permanently placed with responsible and competent substitute parents and families in safe and secure home; and

(B) The presumption increases in importance proportionate to the youth of the child upon the date that the child was first placed under foster custody by the court[.]

The first two prongs of the HRS § 587–73 test thus provide the legislative standards for establishing parental "unfitness" that will support a divestiture of parental rights. The third prong of the test focuses on whether parental termination is in the "child's best interest."

The HRS chapter 587 process for divesting a parent of his or her rights in a child must be applied in accordance with the relevant case law discussed above. In this regard, we have several observations about the chapter 587 process.

### 1.

We note, first of all, that because the purpose of HRS chapter 587 is "to make

(12) Whether the child's family has resolved or can resolve the identified safety issues in the family home within a reasonable period of time;

(13) Whether the child's family has demonstrated the ability to understand and adequately parent the child especially in the areas of communication, nurturing, child development, perception of the child and meeting the child's physical and emotional needs; and

(14) Assessment (to include the demonstrated ability of the child's family to provide a safe family home for the child) and recommendation.

(b) The court shall consider the likelihood that the current situation presented by the guidelines set forth in subsection (a) will continue in the reasonably foreseeable future and the likelihood that the court will receive timely notice of any

paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm" and to make "provisions for the service, treatment, and permanent plans for these children and their families," HRS § 587–1 (Supp.1999), the legal process established by chapter 587 focuses not only on the child who has been harmed or threatened with harm, but on the child's entire family [34] and the willingness and ability of the child's family to provide the child with a safe family home.

For example, HRS § 587–11 (1993) provides that

[p]ursuant to [section] 571–11(9), the [family] court shall have exclusive original jurisdiction in a child protective proceeding concerning any child who was or is found within the State at the time the facts and circumstances occurred, are discovered, or are reported to the department, which facts and circumstances constitute the basis for the finding that the child is a child whose physical or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm by the acts or omissions of the *child's family*.

(Emphasis added.) Additionally, HRS § 587–31 provides that a petition invoking the jurisdiction of the court under chapter 587 "shall state that unless the *family* is willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, their respective parental and custodial

change or changes in the family's willingness and ability to provide the child with a safe family home.

34. "Family" is defined very broadly in HRS § 587–2 (1993) as follows:

"Family" means each legal parent, the natural mother, the natural father, the adjudicated, presumed, or concerned natural father as defined under section 578–2, each parent's spouse, or former spouses, each sibling or person related by consanguinity or marriage, each person residing in the same dwelling unit, and any other person who or legal entity which is a child's legal or physical custodian or guardian, or who is otherwise responsible for the child's care, other than an authorized agency which assumes such a legal status or relationship with the child under this chapter.

duties and rights shall be subject to termination." (Emphasis added.) Similarly, HRS § 587–63(b) states that "[i]f facts sufficient to sustain the petition under this chapter are ... [e]stablished in accordance with this chapter, the court shall enter an order sustaining the petition and a finding that the child is a child whose physical or psychological health or welfare has been harmed or is subject to threatened harm by the acts or omissions of the *child's family*." (Emphasis added.) *See also* HRS § 587–71 (setting forth dispositional options available to the family court upon the court's determination of whether "the *child's family* is presently willing and able to provide the child with a safe family home") (emphasis added); HRS § 587–72 (requiring the family court, at each review hearing, to "[d]etermine whether the *child's family* is presently willing and able to provide the child with a safe family home" with or without the assistance of a service plan) (emphasis added); HRS § 587–25 (establishing safe family home guidelines which the family court is mandated to fully consider "when determining whether the *child's family* is willing and able to provide the child with a safe family home") (emphasis added).

Pursuant to HRS § 587–41 (1993), the following burdens of proof are applicable at hearings under HRS chapter 587:

(b) In an adjudication hearing, a determination that the child has been harmed or is subject to threatened harm shall be based on a preponderance of the evidence.

(c) In subsequent hearings, other than a permanent plan hearing, any determination shall be based on a preponderance of the evidence.

(d) In a permanent plan hearing, a determination that a permanent plan shall be ordered based upon clear and convincing evidence.

In other words, decisions of the family court at adjudication, disposition, and other preliminary hearings under chapter 587 focus on the child's family and are subject to the preponderance, rather than the clear and convincing, evidentiary standard of proof.

It is only at the tail end of the process, when a permanent plan hearing is held to determine whether a child should be placed in permanent foster custody, that focus shifts to determining whether clear and convincing evidence exists to support a divestiture of an individual parent's rights. *See* HRS § 587–73. At this juncture, HRS § 587–73(a)(3)(A) mandates that the family court "shall presume that ... [i]t is in the best interests of a child to be promptly and permanently placed with responsible and competent substitute parents and families in safe and secure homes." Additionally, HRS § 587–73(a)(3)(B) provides that the foregoing "presumption increases in importance proportionate to the youth of the child upon the date that the child was first placed under foster custody by the court[.]"

Inasmuch as both the United States and Hawai'i Supreme Courts have declared that parental rights cannot, consistent with due process, be involuntarily terminated without a showing of "parental unfitness" by the clear and convincing evidence standard of proof, we conclude that an individual parent cannot have his or her rights in a child involuntarily divested at an HRS chapter 587 permanent plan hearing based upon a general determination that the "child's family," as opposed to the individual parent, is unable to provide the child with a safe family home. An individualized determination of the individual parent's "unfitness," supported by clear and convincing evidence, must be made.

We also conclude, in light of the relevant case law, that the statutory presumption in favor of substitute parents and families at the permanent plan hearing is constitutionally improper.

Additionally, we hold, in light of *Woodruff* and *Santosky*, that it is improper at an HRS § 587–73 permanent plan hearing to order a divestiture of parental rights based primarily on a determination that it is in the "best interests of the child" to do so. Because of the sacredness of parental rights, clear and convincing evidence of a parent's "unfitness" is required before the parent's rights in a child can be divested.

2.

HRS § 587–11 (1993) provides that the family court's exclusive original jurisdiction in a child protective proceeding concerns

any child who was or is found within the State at the time the facts and circumstances occurred, are discovered, or are reported to the department [of human services], which facts and circumstances constitute the basis for the finding that the child is a child whose physical or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm by the acts or omissions of the child's family.

Under the definition of "harm" set forth in HRS § 587-2,[35] the only forms of non-physical harm included in the definition are "[e]xtreme mental distress" and "[g]ross degradation."

The focus of the first two prongs of the three-part test for determining whether divestiture of parental rights should be ordered is on whether the child's parent is presently willing and able or will become willing and able to provide the child with a safe family home. The guidelines set forth in HRS § 587-25 [36] that must be considered by a family court in evaluating whether a child's parent is presently willing and able, or will become willing and able, to provide a child with a safe family home, however, are not limited to evaluating whether the parent whose rights in a child are sought to be divested has, by act or omission, engaged in conduct that has subjected the child's physical or psychological health to harm, imminent harm, or threatened harm.

For example, the guidelines require a consideration of the child's "[p]eer and family relationships and bonding abilities[,]" how the child was parented, and "[w]hether the child's family has demonstrated the ability to understand and adequately parent the child especially in the areas of communication, nurturing, child development, perception of the child and meeting the child's physical and emotional needs[.]" HRS § 587-24(a). Additionally, the guidelines focus not only on the conduct of a parent in providing a child with a "safe" home, but on whether a parent has provided a child with a "loving and nurturing" home. HRS § 587-1.

In light of the relevant statutory provisions and case law, however, we conclude that in order for the family court to have jurisdiction to divest a parent's rights in a child under HRS chapter 587, there must be a finding, based on clear and convincing evidence, that the parent whose parental rights are being divested has, by act or omission, subjected a child's physical or psychological health or welfare to imminent harm, harmed, or threatened harm.

### 3.

In *Woodruff v. Keale*, the Hawai'i Supreme Court declined to set out parameters for the "best interests of the child" standard. 64 Haw. at 99, 637 P.2d at 769. The supreme court also stated that some of the factors that could be considered in determining the best interests of the child included: the past and present conditions of the home and the natural parents; the child's own desires; the child's emotional and physical needs; and the reports concerning the child's care, custody, and welfare. *Id.*

We agree with the New Jersey Supreme Court, however, that

the "best interests" of a child can never mean the better interests of the child. It is not a choice between a home with all the amenities and a simple apartment, or an upbringing with the classics on the bookshelf as opposed to the mass media, or even between parents or providers of vastly unequal skills.

*New Jersey Div. of Youth and Family Servs. v. A.W.*, 103 N.J. 591, 512 A.2d 438, 442 (1986).

### 4.

The HRS chapter 587 process for divestiture of parental rights revolves around the service plan that a parent under family supervision or whose child is in foster custody must adhere to in order to facilitate return of the child to the family home or to prevent the child from being placed in permanent foster custody. *See* HRS § 587-26. Pursuant to HRS § 587-72, whenever the family

---

**35.** See footnote 12, *supra.*

**36.** See footnote 31, *supra.*

court places children in foster custody or a family under supervision, review hearings are set before the court at intervals no longer than six months. At the review hearings, the family court is required, among other things, to "[d]etermine whether the parties have complied with, performed, and completed *each and every term and condition of the service plan* which was previously court ordered[.]" HRS § 587–72(c)(4) (emphasis added).

■ In light of the important parental rights and interests at stake, however, we conclude that it is constitutionally improper for a permanent custody order to be entered divesting a parent of his or her parental rights in a child, based solely on the parent's failure to strictly comply with a court-ordered service plan over a reasonable period of time.

Terminating parental rights based on such grounds improperly focuses a permanent plan hearing on whether a parent did exactly what he or she was told, rather than on whether the parent is unwilling or unable to adequately provide for the safety and survival of the child. Moreover, requiring strict compliance with a court-ordered service plan shifts the power to make basic decisions about the safety and welfare of a child to the social worker who prepares the service plan, monitors parental compliance with the plan, and thereafter testifies about parental compliance with the plan.

With the foregoing legal framework in mind, we turn to a review of the evidence adduced below to determine whether it is sufficient to support the entry of that part of the Permanent Custody Order that divested Mother of her parental rights in Jane.

B. *The Evidence in This Case Does Not Support a Divestiture of Mother's Parental Rights in Jane*

■ In divesting Mother's parental rights in Jane, the family court entered findings relative to Mother that focused on Mother's: (1) personality and background, (2) parenting skills and style, (3) failure to strictly comply with all the terms of her service plans over the years, (4) failure to be protective of Jane,

(5) failure to be "open and forthright with the various service providers in this case," and (6) failure to show progress and internalize the concepts she has learned in the services she was ordered to attend over the years.

In reviewing the record on appeal, we note that none of the social workers, outreach workers, therapists, or nurses who had directly worked with Mother ever claimed that Mother had abused, harmed, or neglected Jane. They all agreed that Mother was a loving, kind, and caring person who was deeply devoted to and bonded with Jane. Additionally, they concurred that Mother was able to provide for Jane's physical needs and was able to provide a safe home for Jane.

In filing the Petition in this case, DHS claimed that Jane was subject to imminent harm by Grandfather, Legal Father, or Father, all of whom had prior sexual or physical assault histories. However, the evidence adduced below clearly showed that Grandfather died of cancer a few months after the Petition was filed, never having seen Jane. Additionally, Legal Father had been deported to Western Samoa and was not around to endanger Jane's life or safety. Finally, Father had never lived with Mother or been alone with Jane due to DHS's concerns and the probation conditions imposed on him. Ironically, according to the evidence in the record, the only harm ever suffered by Jane occurred when she was in the care of a foster family, prompting DHS to move Jane to a new foster home.

In summary, there was no clear and convincing evidence that Mother was unwilling or unable to provide Jane with a safe family home and was thus unfit to retain her parental rights in Jane. In light of the dearth of evidence that Jane was harmed, subjected to harm, or threatened with harm while under Mother's care, we conclude that the family court clearly erred in entering the Permanent Custody Order, divesting Mother of her parental rights in Jane.

C. *Other Concerns*

Although our conclusion that there was no clear and convincing evidence to support the family court's divestiture of Mother's parental rights in Jane is dispositive of this appeal,

we mention some concerns that we have about the manner in which the HRS chapter 587 process was applied to Mother in this case.

### 1.

As noted above, Jane was only a day old when police officers removed her from the hospital and placed her in the temporary foster custody of DHS. This police action was initiated by DHS, based on an anonymous phone call that DHS never bothered to confirm or even discuss with Mother. DHS's actions prevented Mother from nursing Jane and providing the maternal warmth and bonding that Jane needed to thrive as a newborn infant. Additionally, DHS's action was based on dated information and the testimony of an expert who had never even met Mother. In light of the important parental rights at stake, we conclude that DHS should have done some preliminary investigation into the anonymous allegations before filing the petition for temporary custody.

### 2.

At the hearing on DHS's petition for temporary foster custody of Jane, there was overwhelming evidence that Jane was not in any imminent danger of harm. Therefore, the family court denied the petition and returned Jane to Mother, under temporary family supervision. At a return hearing, the family court again denied DHS's request that Jane be placed in foster custody and instead ordered that Jane be returned to the family home under DHS supervision.

Shortly thereafter, DHS, seemingly dissatisfied with the family court's denial of its petition, used an innocuous incident to assume emergency foster custody of Jane. The incident at the DHS office transpired while Mother and Father were waiting for the arrival of a DHS worker to supervise a visitation between Father and Jane and Mother, at the direction of a DHS employee, nursed Jane in a private room in Father's presence. Although there is no evidence that Jane was subjected to any type of harm as a result of the incident, and indeed, we cannot imagine what kind of harm DHS believed Father could have inflicted on Jane in such a public

setting, DHS claimed that the incident demonstrated Mother's inability to protect Jane from Father and comply with the terms and conditions of Father's probation.

Instead of immediately warning Mother that Father should not be in the same room with Jane, DHS used the incident to have Jane picked up by police and thereafter, to initiate court proceedings against Mother and assume foster custody of Jane. In light of the important rights that a parent possesses in his or her natural children, however, DHS's zero tolerance for understandable mistakes or misunderstandings by Mother is troubling.

### 3.

Throughout the proceedings below, DHS maintained, and the family court eventually found, that Mother "is unable to be protective and will continue putting [Jane] at risk of threatened harm." It is unclear to us, however, what Mother was expected to do to "protect" Jane from harm. The testimony indicated that Mother had never left Jane alone with Father, Grandfather, or Legal Father. Indeed, the testimony of DHS witnesses during the proceedings below was that Mother was overprotective and "constricting" because her idea of "protecting" her children, even her teen-aged Oldest Daughter, was to keep them with her for twenty-four hours a day.

It appears from the record that DHS may have believed that Mother was unable to be protective of Jane because Mother did not totally sever her relationship with Father, a convicted sex offender. However, if it was DHS's belief that Mother needed to break off her relationship with Father in order to demonstrate her ability to be "protective" of Jane, such a requirement was never communicated to Mother. Indeed, Kawaji expressly testified that she never told Mother that she had to break up with Father in order to keep Jane. Moreover, in a number of safe family home reports filed with the family court, DHS stated that one of the strengths of Jane's family was that Father supported Mother in services and provided financial support for Jane.

We take judicial notice, moreover, that despite a parent's best and most conscientious efforts, it is not humanly possible for a parent to completely protect a beloved child against all danger or harm in this world. Children fall, and they sometimes get bruised or hurt. While every parent prays that his or her child will never get assaulted, or raped, or murdered, tragedies occasionally occur, through no fault of a parent.

In this case, if Mother had willfully exposed Jane to harm or danger, a divestiture of her parental rights might be justified. However, in the absence of any proof that Mother personally endangered Jane's physical or psychological health or welfare, we conclude that the evidence simply does not support the divestiture of Mother's parental rights in Jane.

#### 4.

The family court found that Mother failed to understand how her past history has a "detrimental effect on Jane's physical and psychological well-being." It is not clear to us, however, exactly what Mother was supposed to "understand." Mother cannot change or undo her sad past, and to hold her responsible for the sins of others is unfair. The fact that Mother has chosen not to dwell on the tragedies of her past but to move forward in life without anger or bitterness is laudable. As Mother noted, having been abused herself, she knows the pain and anguish that comes from being abused and is anxious to protect Jane from a similar experience.

#### 5.

DHS maintained throughout these proceedings, and the family court found, that Mother lacked understanding and consistency in providing structure, guidance, and discipline to Jane. However, it is not clear what DHS's expectations were for Mother and what "structure, guidance, and discipline" Mother was supposed to provide to Jane. Did DHS expect Mother to put Jane to bed at the same hour each night, brush Jane's teeth after every meal, or punish Jane in a certain way if she threw a tantrum? While parenting books may instruct parents to be "consis-

tent" in dealing with their children, the reality of life is that parents have to "roll with the punches" and be flexible enough to deal with unplanned or unexpected occurrences that are sure to arise. If lack of consistency in providing structure, guidance, and discipline to a child are grounds for involuntary termination or divestiture of parental rights, there would be many more children, perhaps the overwhelming majority of children in Hawai'i, who would be wards of the State.

#### 6.

■ A number of witnesses testified at the permanent plan hearing that Mother loved Jane, was able to provide for Jane's physical needs, and was able to provide a safe home for Jane. Their concern with Mother was that she was not "nurturing" enough. However, in the absence of any finding that Mother had, by acts or omissions, subjected Jane's physical or psychological health or welfare to imminent harm, harm, or threatened harm, we conclude that lack of sufficient "nurturing" cannot constitutionally amount to "parental unfitness" that justifies divestiture of parental rights.

Mother's GAL testified at the permanent plan hearing that he was not concerned that Mother would abuse Jane or endanger her life. His concern was Mother's failure to strictly comply with all the terms of her court-ordered service plan. Moreover, the family court's conclusion that Mother was not presently willing and able, and it was not reasonably foreseeable that Mother would become willing and able, to provide Jane with a safe family home, appears to be based partly on various findings by the family court that Mother had not complied with the different requirements imposed on her by the court-ordered service plans.

For example, the family court found that Mother "frequently cancelled visits with [Jane] and her siblings due to illness, other appointments, or other personal obligations," was "inconsistent in attending therapy sessions, which impeded her ability to reach her goals[,]" and "failed to follow directions that DHS felt were necessary to the well-being of all her children, despite repeated and clear instruction."

■ Our review of the record indicates, however, that although Mother missed some of her sessions, the legitimacy of her excuses for the missed sessions was never questioned. Clearly, even the best-intentioned individual sometimes misses or is late for an appointment. Moreover, in light of the relevant case law, the focus of a hearing to consider divesting a parent's rights in a child must be on the unfitness of a parent and not on whether the parent has complied with every single term of a service plan, especially when the failure to comply is excusable and does not harm the child's physical or psychological health or welfare.

### 7.

The family court's findings fault Mother for never having a job and not having the training or education to enable her to secure a job. It is abundantly clear from the record, however, that Mother was running herself ragged trying to comply with her service plan and all the requirements placed on her by the different therapists and service providers she was required to meet with under the service plan. Given her service plan requirements, it would be extremely difficult and unrealistic for Mother to find employment. Additionally, the record indicates that when Mother did go job-hunting, causing her to call DHS a little late to confirm her next weekly Friday visitation with her children, she was punished by having all her subsequent Friday visitations with her children canceled.

### CONCLUSION

In light of the foregoing discussion, we reverse that part of the July 30, 1998 order that divested Mother of her parental rights in Jane and awarded permanent custody of Jane to DHS and remand this case to the family court for further proceedings consistent with this decision.

